HAMLIN, Justice:
 

 John T. Hopper and Joe A. Woodard, defendants, were jointly indicted for the crime of murder (LSA-R.S. 14:30) of Joseph Ralph Beeson. They were tried, found guilty of “Manslaughter,” and sentenced to serve fifty-nine (59) months at hard labor in the Louisiana State Penitentiary. On appeal to this Court, they present for consideration fifty-three bills of exceptions.
 

 Bill of Exceptions No. 1 was reserved when the trial court overruled defendants’ objection to the association of Chris J. Roy (allegedly the brother of District Attorney Anthony J. Roy, Jr.) in the prosecution of this case. Herein, counsel for defendants argue that there was no authority for the association, and that LSA-R.S. 15:17 is unconstitutional insofar as it provides a method of appointment of assistant district attorneys different to that set forth in Art. VII, Sec. 60, La.Const. of 1921.
 

 Sec. 60 of Art. VII, La.Const. of 1921, provides:
 

 “In each judicial district, the Legislature shall have the power to create and provide one or more assistant district attorneys, said assistant district attorney to be selected and appointed by the district attorney of said judicial district, subject to removal at his discretion, and commissioned by the Governor.”
 

 LSA-R.S. 15:17 provided:
 
 [1]
 

 “Subject to the supervision of the.attorney-general, as hereinafter provided, the district attorney shall have entire charge and control of every criminal prosecution instituted or pending in any parish wherein he is district attorney, and' shall determine whom, when, and how he-shall prosecute; provided, that every district attorney shall have the right to employ or to- accept the assistance in the conduct of any criminal case of such counsel as to him may seem fit.”
 

 We find no conflict between LSA-R.S. 15:17 and Art. VII, Sec. 60, La. Const, of 1921. LSA-R.S. 15:17 is merely a legislative enactment carrying into effect the constitutional provision. The jurisprudence has been legion that private counsel may be employed to assist the Attorney General or the district attorney in the trial of a criminal cause. State v. Petrich, 122 La. 127, 47 So. 438; State ex rel. Stewart v. Reid, 113 La. 890, 37 So. 866; State v.
 
 *98
 
 Mack, 45 La.Ann. 1155, 14 So. 141. Defendants have not shown prejudice.
 

 Bill of Exceptions No. 1 is without merit.
 

 Bill of Exceptions No. 2 was reserved when the trial judge sustained the objection of the district attorney to being questioned on cross-examination during the hearing of the Motion to Suppress Evidence.
 

 Prior to the trial judge’s ruling, counsel for defendants asked the district attorney the following question after having called him under cross-examination:
 

 “And in that connection as District Attorney was there brought to your attention on April 19th., 1964 [the day the instant crime is alleged to have been committed] any information regarding an occurrence out at the Pelican Club here in Marksville that resulted in the death of the young Beeson boy?”
 

 After responding affirmatively to this question, the district attorney was asked at what time the information was brought to his attention. He then said:
 

 “Judge, at this stage I’d like to say this and make this objection.
 

 “First of all I wish that this tragedy had never occurred.
 

 “Secondly, that I'have a job to perform here and this is an adverse proceeding and I don’t feel that counsel for the defense has a right to cross examine me, there is no such procedure, as District Attorney and I feel that there will be a time in this case when I will perhaps have to take the stand and until such time I would — at that time I would be subj ect to cross examination. Until that time does arrive, I object to being questioned as to what occurred or any of my notes or information that I may possess as District Attorney because in effect the District Attorney is the State’s (inaudible) in any criminal case. For those reasons I object to being called under cross examination at this time.”
 

 In sustaining the objection of the district attorney, the trial judge stated that counsel for defendants had other avenues to determine all of the facts and circumstances that had any bearing upon the statements that were made (allegedly by defendants) and were being sought to be suppressed. The court said that those avenues would not subject the district attorney to reveal information. The court felt that the information received by the district attorney and the information in his possession as well as what prompted him to act were perhaps based upon confidential information that the district attorney had a right to refuse to divulge.
 

 Herein, counsel for defendants argue that they were not attempting to get the district attorney to divulge any secret information or evidence he had in his files. They contend that the trial court committed prejudi
 
 *100
 
 cial error to the rights of the accused; they argue that since the district attorney freely and frequently took the witness stand during the trial of the case before the jury, he should not have been averse to taking it on the hearing of the Motion to Suppress Evidence. Finally, counsel contend that the action of the district attorney was not consonant with the basic concept of a “fair and impartial” trial, his attitude not being that prescribed in State v. Tate, 185 La. 1006, 171 So. 108:
 

 “The district attorney is a quasi’judicial officer. He represents the State, and the State demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers as it is to see that no guilty man escapes. * * * Therefore he should not be involved or interested in any extrinsic matters which might, consciously or unconsciously, impair or destroy his power to conduct the accused’s trial fairly and impartially.”
 

 Under the circumstances existing at the time this bill was reserved, we do not find that the constitutional rights of the defendants were violated. Likewise, we do not find that the trial judge abused his discretion in ruling as he did. No Louisiana authority holding that a district attorney must testify under cross-examination on the hearing of a Motion to Suppress Evidence has been pointed out to us.. Our research reveals none. Defendants have not shown prejudice. Therefore, we conclude that the defendants were not prejudiced and suffered no deprivation of rights afforded at a “fair and impartial” trial.
 

 Bill of Exceptions No. 2 is without merit.
 

 Bill of Exceptions No. 3 was reserved when the trial judge permitted Trooper Carl Clifford Slaughter of the Louisiana State Police to answer the following question:
 

 “Trooper, would you answer the question as to whether you could hear traffic between the various Avoyelles Parish units, the mobile units, and also the main station here in the Sheriffs office, regarding the incident and killing at the Pelican Club?”
 

 Trooper Slaughter’s answer was in the affirmative.'
 

 Counsel for defendants contend that the trial court was in error in permitting this witness to testify as to what he heard over the radio when he was not a party to the communication. It is contended that his testimony was hearsay.
 

 A reading of the entire testimony of this witness reflects that the testimony was technical in great part; he described the radio operations at his communications center. Trooper Slaughter was on duty as the radio operator, in Troop E headquarters in Alexandria, Louisiana, from midnight April .19,
 
 *102
 
 1964 until sometime later in the'morning; Troop E has jurisdiction over Avoyelles, Rapides, Natchitoches, Winn, Grant, LaSalle, Concordia and Catahoula Parishes.
 

 Because of the seriousness of the instant occurrence, there were many radio communications concerning it. Defendants suffered no prejudice from Trooper Slaughter’s affirmative answer. Defendants have shown no prejudice. We find that the testimony objected to was only incidental to-the entire testimony.
 

 Bill of Exceptions No. 3 is without merit.
 

 Bill of Exceptions No. 4 was reserved when the trial judge permitted certain witnesses to answer allegedly improper questions propounded to them during thepre-trial proceedings on the Motion to Suppress Evidence.
 
 [2]
 

 
 *104
 
 Counsel contend that the' answers of the witnesses prejudiced the rights of the defendants, and that the cumulation of such errors impeached the fair and impartial character of the proceedings. State v. Henry, 196 La. 217, 198 So. 910.
 

 We find that the testimony objected to was relevant to the Motion to Suppress Evidence. It was therefore not cumulatively erroneous. Defendants have not shown, and we do not find that defendants suffered prejudice from the admission of the testimony. The rules of fairness and impartiality were not violated.
 

 Bill of Exceptions No. 4 is without merit.
 

 Bill of Exceptions No. 5 was reserved when the trial judge overruled defendants’ Motion to Suppress Evidence. The motion sought to have excluded from the evidence the following unsigned oral statements given to Major Harold J. Henderson, Chief Deputy in the Sheriff’s Office of Avoyelles Parish, shortly after the apprehension and arrest of the defendants:
 
 [3]
 

 “Statement given to Deputy Henderson on above date at 4 :AM with reference to altercation at Pelican Club in Marksville on night of 4/19/64 at approximately 1:30 AM.
 

 “My name is Joe Woodard. I am 20 years of age and iive at Delhi La. I attend school at La Tech in Ruston La. We left Ruston yesterday P.M. at about 4:00 P.M. in my car (1963 Corvair) in Route to Marksville to the Pelican Club. John Hopper, Billy Frazer and Charlie Gaharae were in the car with me. We arrived in Marksville about 8 PM last night and got a room at the Ranch House Motel. Then we went to the Pelican Club. We got there between 8:00 and 8:30 P.M. Upon arriving I drank maybe two beers. I don’t know what the other boys had to drink while I drank the beer. Then Billy Johnny and I went together and bought a Sth of whiskey. We sat at a table with five of my friends from La. Tech and drank the th of whiskey.
 

 “There were 4 or 5 girls sitting at the table near ours. Me and Charlie Gaharae were dancing with 2 of the girls, Maria & Eunice. I don’t know their last name.
 

 
 *106
 
 “While Charlie and myself were talking and dancing with the two girls, Billy and John took the whiskey from our table and took it to the table where Jimmy Nobles and his wife were sitting. When I wanted a drink I would walk over to Jimmy’s table and mix a drink and go back dancing. When we finished the 1st 5th it was about 10 :30 or 11:00 PM. We then bought another 5th. We first had the 5th on Jimmy’s table then Johnny or Billie moved the whiskey to the table where the girls were sitting. Between 12:00 & 12:30 AM Maria and Eunice left to go home then I went to the table where John, Billy and the girls were sitting. The boy that died and 1 or 2 more were sitting at the same table. I was there just a few minutes when an argument started about some whiskey. Jimmy accused the boy that died of taking some whiskey from his table. When Jimmy came over to the table where Johnny, Billie, Charlie and I and 4 girls (I don’t know the girls) the boy that died was sitting there also. Jimmy and the deceased boy had a few words. Jimmy saw the empty
 
 yi
 
 bottle on the floor near the feet of the deceased which he said was his (Jimmy’s).
 

 “They Jimmy and the deceased had a few words then Jimmy took a half pint of rum and went back to the table where his (Jimmy’s) wife was sitting. Johnny saw the deceased pour himself a drink from the 2nd 5th we had bought. He told him not be drinking out of his whiskey. It was 5 or 10 minutes after 1:00 AM. Johnny danced a couple of times. When he came back to the table the deceased was pouring another drink. Johnny got mad when he saw that. By the way they were acting I thought they were going out side to fight. They left where they were and started out side. They had taken a few steps when Billy and myself and two boys who were with the deceased followed them out side the club. We all went thru the front door. Johnny and the deceased were walking ahead of myself, Billy Frazier and two other boys. We paused at the corner and Johnny and the deceased walked by the building where a Red Panel Truck was parked. They were standing by the truck arguing like they were going to fight. The boys who were with me stopped and I went to where Johnny and the deceased were arguing.
 

 “Just before I got there the deceased hit Johnny on the side of the head with a glass. I then ran up and grabbed the deceased. I was holding him and Johnny hit him once or twice while he was standing up. We then pushed him down between the concrete slab and the Truck. Then we both hit him 4 or 5 times each while he was down. Most of the blows landed on the head. I then kicked him on the side of the head. Johnny hit him a couple of times on the head after I
 
 *108
 
 kicked him. Then we saw a whole lot of blood on the concrete slab.' The slab is on the East side of the Building about half way to the back.
 

 “When Johnny and I saw the blood we ran back to the front of the club where the car was parked. About that time Jimmy and Charlie were coming out the front. Billy had the bottle of whiskey which he gave to Johnny then he ran and got Charlie then we all 4 got in the car and left. We went to the Ranch House Motel where we washed the blood off of Johnny. Two officers from Marksville came and picked us up. The blood washed off Johnny’s head was caused by a cut on the ear when he was hit by the deceased.
 

 “Page 1-2-3-4 was given voluntarily by Joe Woodard who admitted before Deputy Hebert Bordelon and Police Chief Paul Dubea that statement was given without threat — duress or promises.
 

 “H. Henderson
 

 “Chief Paul Dubea
 

 “Dpy. Hebert J. Bordelon”
 

 “Statement given to Dr. Henry Kaufman, Chief Paul Dubea and Deputy Harold Henderson on above date at 6:00 o’clock A.M. with reference to altercation at Pelican Club in which Joseph Ralph Beeson- was killed.
 

 “My name is John Towne Hopper. I am, 21 years of age and live at Delhi La. T attend college at La Tech in Ruston La. We, Billy Frazier, Joe Woodard, Charlie Gaharae and myself left Ruston about 4:00 P.M. Sat 18th and came to Marks-ville. We got here a little before 8:00-PM and got a room at the Ranch House Motel. We then left the motel and went to the Pelican Club arriving about 15 or 20 minutes past eight. I’m not sure of' the time. When we got to the Club we met some boys we knew from Tech.. Then we all started drinking whiskey. When we first got there we bought a 5th of whiskey. Me, Joe, Charlie and Frazier and some more boys from Tech were-sitting at one table. I danced one time. I don’t know the girl’s name I danced' with.
 

 “After a while another boy from Tech came to our table. His name was Jimmy Nobles who said he had his wife with him. We talked to Jimmy a little bit then he invited me to the table where his wife-was. I talked to them a while then Joe came up. Jimmy told us to bring our whiskey and sit with them. Dave Parrot and his wife were with the Nobles at the-table. After we talked to the Nobles a while I went back to my table. I don’t know if Joe walked back with me or not,, but when I got back to our table Joe was. there. We rummaged around talking and drinking. Joe and I decided we would' take our bottle of whiskey (a 5th) and go back to Jimmy’s table. We talked a while-
 
 *110
 
 at Jimmy’s table. There were some girls at another table. One of the girls name was Jeanie Levergne. I don’t know the other girls’ names. I danced with Jeanie 1 or 2 times. I was drinking whiskey while we talked and danced. I would go back and forth between the two tables— the girls table and the Nobles table. That went on til the band took a break around midnight.
 

 “During the break I just milled around and went back to the table where some of the boys I knew were. Later on about 20 or 30 minutes the band started playing. I told Joe and Frazer Lets get another 5th. Frazer and I went to get the whiskey ice and cokes. We took the 5th and put it on Nobles table.
 

 “I fixed myself a drink and walked over to the girls table with the drink in my hand. Jeanie and myself would go out and dance then come back and sit down. We danced a couple of time and I was out of a drink. I then went over to Nobles’ table to get a drink. I picked up the whiskey and coke and took them back to the girls table. I asked the girls if they wanted to drink and they said no so I mixed me another drink. We would dance some and when we come back to the table my drink would be missing. It happened 1 or 2 times then I would get a glass and mix another one. Right along then I was getting pretty drunk. I guess. I don’t know what time it was when the 4 girls said they were leaving.
 

 “I walked up front with them talking and Jean told me her name was Jean Levergne and she worked in Baton Rouge. They left and I walked back to the table where my whiskey was. Joe was at the table when I got there and I think Nobles was there. I don’t remember when he came. Nobles said he was missing some whiskey. There was two other boys at the table where where my whiskey was. Then we all got ready to go. Then those two boys got up. I don’t know who they were. We were all leaving the club. One of the boys started talking as we walked out. We were leaning on one another. I mean the boy who turned out to be Bee-son. We kept walking toward the out side and when we got outside I asked him if he had been getting any whiskey off the table. We stopped walking and started facing each other. I then heard some one coming up from behind. I turned around to see who it was then Beeson hit me on the left side of my head with a glass or bottle. I don’t know what it was. I automatically turned and started hitting him.
 

 “I don’t know what all happen. I remember hitting him after he hit me with the glass. The next thing I remember, he was down and I was hitting him.in the face with my fist. When I got up Joe jumped back. I then said let’s go get in
 
 *112
 
 the car and get out of here. Then when we got in the car we saw Frazer. We said get Charlie and let’s go. We then picked up Charlie and Frazer in front of the club. We finally got back to the Ranch House Motel. I went in the bath room to stop the bleeding of my ear. I had blood on my shirt, chest and neck. Jimmy Nobles and wife came in the room and Jimmy asked us what happened. We told him we got in a fight with this boy. Then someone knocked on the door. I thought it was the owner so I went in the bath room so he wouldn’t see the blood. Then I heard talking and thought it was the officers so I got in a closet because I was scared. After every body left I went and layed on the bed. In about 10 minutes the State Police came in and picked me up.
 

 “John Hopper agreed that statement is correct and that said statement was given without threat or duress or promises but refused to sign.
 

 “Chief Paul Dubea “Henry J. Kaufman, Jr.”
 

 Counsel for the defendants contend that the rights and immunities of the defendants were violated as follows: . .
 

 “1. Any statement purportedly made by them was during and subsequent to their arrest, which was illegal and in violation of their rights under the Fourth and Fourteenth Amendments to the United States Constitution, said arrest being without ‘probable cause.’
 

 “2. Any such statement was not given by either of the defendants freely and voluntarily, and in the securing of same, their rights under the Fifth and Fourteenth Amendments to the United States Constitution; and Article 1, Section 2 and Article 1, Section 11, of the Louisiana Constitution were violated by those securing any such statement.
 

 “3. Any such statement was secured while the defendants were without assistance of counsel; they were denied the right of counsel prior to making any such statement; their counsel was not present at the time of their making any such statement; they were not advised of the consequences that might follow from their making any such statement; they were not advised of their right to have counsel present at the time of making any such statement; they were not advised of their right to remain silent and not to make any statement; all in violation of their constitutional and statutory rights under the Sixth and Fourteenth Amendments to the United States Constitution, Article 1, Section 2 of the Louisiana Constitution, and Article 1, Section 9 of the Louisiana Constitution, and Section 142 of the Louisiana Code of Criminal Procedure.
 

 “4. They were not accorded their rights under Sections 80, 81 and 82 of the Louisiana Code of Criminal Procedure.”
 

 
 *114
 
 THE LEGALITY VEL NON OF THE ARREST.
 

 On April 19, 1964, Reese McNeal, Deputy Sheriff in Avoyelles Parish and radio operator, was on duty in the radio room of the Sheriff’s office. Chief of Police Paul Dubea of the City of Marksville, who used the radio facilities of the Sheriff’s office because of the inadequacy of City facilities at that time, was also in the office. At approximately 1:30 A.M., Chief Dubea answered a telephone call and was told that a truck had run over a boy and to call an ambulance. An ambulance was thereupon dispatched to the Pelican Club.
 

 On arrival at the Pelican Club, Chief Dubea and Officer Pete DeNux were confronted with a crowd of between forty and fifty persons, a number of them allegedly being drunk. Lying on a concrete slab in a puddle of blood was the instant victim, Joseph Ralph Beeson. While mixing in the ■crowd, Chief Dubea determined that the victim had not been run over; that he had ■allegedly been beaten. A young woman told him that three boys, whom she did not know, had driven off in a white Chevrolet Corvair; she gave him a description of the ■car and the license number.
 

 We believe that the evidence is replete to the effect that Chief Dubea had sufficient information to indicate that the three boys had fled the scene of the altercation, and that they had driven to the Ranch House Motel.
 

 Chief Dubea and Officer DeNux went to the hospital, and on learning that Beeson was dead they returned to the Sheriff’s office where they secured the registration of Woodard’s automobile. They then immediately proceeded to the Ranch House Motel. Upon spotting Woodard’s car, the license number matching that given by the young woman, they inspected it with a flashlight and discovered blood. Chief Dubea, in full dress uniform, and Officer DeNux walked through a crowd of onlookers and “looked in one of the apartments there at the Ranch House, they had a crack in the door and I presumed it might have been the ones that the car belonged to so I went up to the door and I knocked and one of them inside said ‘come in’ so we did, me and DeNux.” (Chief Dubea’s testimony, record p. 620.) In the room were three boys and a woman. With respect to his entry, Chief Dubea testified:
 

 “When I knocked they say come on in, we walked in, I don’t know who said come in but anyway we walked in and I says ‘Mr. Woodard in this room?’ and he says ‘that’s me’, he did he was still in bed. I said ‘is that your car outside?’ he said ‘yes, sir’ I said ‘were you in a fight at the Pelican?’ he said ‘yes, sir’, well I said ‘the boy that you all the fight with, he’s dead’ well he said ‘we knew we had give him a good beating but we didn’t know we had killed him’ I says ‘you are under arrest’ and
 
 *116
 
 one of them says ‘what for’ and I said ‘for murder’. So we come up to the sheriff’s office, I brought Woodard, Frazier, what’s this other guy’s name — ■ this fellow was married, forget his name —had his wife, him and his wife, Nobel, well, we just brought'those three. * *”
 

 Having been arrested, the defendant Joe A. Woodard and his two friends were taken to the Courthouse in the back seat of Chief Dubea’s car; they were not handcuffed. They were brought to the Sheriff’s office where Major Henderson, the Sheriff, the District Attorney, the Coroner, and Allen Normand were present. Chief Dubea testified that Frazier was pretty highly intoxicated and Woodard wasn’t too highly intoxicated. Some short time elapsed before Woodard was interrogated, during which time he remained seated in the Sheriff’s office.
 

 Sgt. Patrick Lemoine of the Louisiana State Police, accompanied by Trooper Eddie Bordelon, received a radio bulletin telling him to be on the lookout for the instant Corvair; they had also received news bulletins with respect to the occurrence at the Pelican Club. The officers concluded some business at the Marksville Hospital, where they were approached by two men who gave them details of the instant offense, and then proceeded to the Ranch House Motel. There they found the defendant John T. Hopper alone and bleeding from his ear; Hopper was concealed in a closet of the room when Woodard and the other two boys (with whom we are not concerned herein) were arrested; Hopper’s testimony affirmed this fact. Sgt. Lemoine told Hopper that he was wanted for murder by the City and Parish Officers and placed him under arrest.
 

 Trooper Eddie Bordelon stated that Hopper answered affirmatively to Sgt. Lemoine’s question as to whether he had been with the boys who had been picked up by the City Police. Bordelon affirmed that Sgt. Lemoine told Hopper he was under arrest; he also stated that Hopper said, “Oh my God, what have we done,”
 

 Hopper was taken to the Sheriff’s office, where he was turned over to the deputies and later questioned by Major Henderson; during the interval he was seated with his friends. During the ride to the Courthouse he had been handcuffed, but his handcuffs were removed upon arrival in the Sheriff’s office.
 

 On the hearing of the Motion to Suppress Evidence, Hopper answered negatively when asked whether the police officer told him he was acting under any specific authority or that he had any charge against him, or warrant for his arrest — that he was being investigated with a criminal offense.
 

 Woodard testified that Chief Dubea told him that Beeson was dead. He said Chief
 
 *118
 
 Dubea told him to come go with him, but that he did not tell him he was under arrest. He answered negatively when asked whether the Chief said “either in the room or at any time to you that you were under arrest or that you were being investigated in connection with any charge.”
 

 James Nobles, who was taken to the Sheriff’s office with Woodard, testified that Chief Dubea told him to come on downtown, and that he did not think Chief Dubea told him or anyone else that they were under arrest.
 

 ' Cyrus William Frazier, Jr., a roommate of Joe Woodward, who was also taken to the Sheriff’s office with Woodard, testified that Chief Dubea did not tell the boys anything about placing them under arrest; that he did not mention any charges.
 

 LSA-R.S. 15 :60 (now Article 213 of the New Code of Criminal Procedure), in effect at the time of the instant offense, provided:
 

 “Any peace officer may, without a warrant, arrest a person:
 

 “(1) For the commission of any felony or misdemeanor committed in his presence;
 

 “(2) When such person has committed a felony although not in the presence of the officer;
 

 “(3) When a felony in fact has been committed and he has reasonable cause to believe that such person has committed it;
 

 “(4) When he has reasonable cause to believe that a felony has been committed and reasonable cause to believe that such person has committed it;
 

 “(5) When he has received positive information by written, telegraphic or other authoritative source that another officer holds a warrant for such arrest.”
 

 As stated supra, counsel for defendants contend that the arrest of the accused was not lawful, for the reason that it was not based on reasonable cause or probable cause as defined in the jurisprudence. They argue that at the time the accused were arrested there was no reliable information from a creditable person which would lead the police officers to reasonably believe that the accused had committed a crime. They say that the basis of arrest made by Chief Dubea of the defendant Woodard could not even rise to the dignity of a mere conclusion which basis for an arrest was condemned in Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723.
 
 [4]
 

 In the very recent case of State v. Johnson, 249 La. 950, 192 So.2d 135, this Court discussed “probable cause” in detail; we find our reasoning in that case applicable here.
 
 [5]
 
 See, also, State v. Bourg,
 
 *120
 
 248 La. 844, 182 So.2d 510; State v. Aias, 243 La. 946, 149 So.2d 400. Cf. State v. Green, 244 La. 80, 150 So.2d 571.
 

 We find that the weight of the evidence supra is to the effect that defendants were told that they were under arrest and were thereafter arrested prior to being taken to the Sheriff’s office. The evidence preponderates to the effect that the arresting officers knew that a felony had been committed; they likewise had probable cause, as shown by the evidence supra, to believe that defendants were involved in the commission of such offense. We therefore conclude that defendants were lawfully arrested, and that their constitutional rights; were not violated by such arrest.
 

 COUNSEL AND THE RIGHT TO REMAIN SILENT.
 

 As stated supra, counsel for the defendants contend that the confessions or admissions, supra, purportedly made by defendants could not be said to have been made-freely and voluntarily in the light of the-totality of the circumstances as revealed, by the evidence. They argue, as stated', supra, that the constitutional rights, privileges and immunities of the accused, as interpreted by the jurisprudence of the United'. States Supreme Court, were unquestionably-denied to them.
 

 
 *122
 
 Harold J. Henderson, Chief Deputy in the Sheriff’s office in Avoyelles Parish, interrogated the defendants on the morning of April 19, 1964 and reduced to writing the statements supra. He testified he commenced interrogating Woodard at approximately 4:00 A.M., and that Deputy Hebert Bordelon and Chief Paul Dubea were in the office.
 
 [6]
 
 Henderson’s testimony with respect to what was told Woodard is as follows :
 

 “Q. Did you tell him that he did not have to make a statement ?
 

 “A. I asked the District Attorney to bring his' rights to him.
 

 “Q. You asked the District Attorney to?
 

 “A. Yes.
 

 “Q. You didn’t explain his rights to him at all yourself, did you?
 

 “A.
 
 I might have said something — told him what the District Attorney said, but the District Attorney was in there at the time and I asked him to explain to Mr. Woodard his rights.
 

 “Q. But you yourself did not undertake to advise him about any of their legal rights, did you ?
 

 “A. Yes.
 

 "Q. What did you tell them?
 

 “A.
 
 The District Attorney told Mr. Woodard and I told Mr. Hopper.
 

 “Q. Told him what?
 

 “A. Of his rights.
 

 “Q. Well what did you tell him is what I want to know and what did the District Attorney tell them what did you say and what did he say ?
 

 “A. Well, I can’t recall, I can tell you in essence of what he said but I can tell you what I said.
 

 “Q. All right, tell us first of all what you say the District Attorney told, we take Woodard first, and tell us what he told him in your presence.
 

 “A. As I recall it he told Mr. Hopper—
 

 “Q. Let’s deal with Woodard first.
 

 “A. I mean Mr. Woodard. Pardon me, it was my error. Mr. Woodard I sat down to take a statement or interview Mr. Woodard, and the District Attorney was there and I said — in essence— ‘before we go any farther, Mr. Roy as District Attorney explain to Mr. Woodard his rights.’
 

 “Q. And what did he say?
 

 “A. He told him that ‘you don’t have to make a statement if you don’t want to and if you make a statement it can be used against you in a Court of law, you are entitled to an attorney’ and that’s the main things I recall him saying.
 

 
 *124
 
 “Q. Did he ask them if they wanted to use the telephone to call an attorney?
 

 “A. Not that I recall.
 

 “Q. Did either of you tell them that they had a right to obtain counsel right then and there if they wanted to?
 

 “A. Well no, I figured two intelligent college boys sitting by a telephone after they had that much explained to them they could use their own discretion as to what they wanted to do at the time. I thought we went at length in explainfing their rights and especially that they didn’t have to talk or say anything.
 

 “Q. But you didn’t tell them that they had a right to immediately get a lawyer and they could call and get a lawyer if they wanted to.
 

 “A.
 
 I told them they had a right to get a lawyer, call a lawyer.
 

 a ‡:
 
 * *
 

 “Q. Could you tell whether Mr. Woodard appeared to have been drinking, whether he was under the influence of alcohol to any extent?
 

 “A. Well, I would say that he had been — appeared that he had been, but he had sobered up somewhat at the time.
 

 “Q. He wasn’t completely sober though was he?
 

 “A. Well, having been the first time I ever saw him I wouldn’t know how it affected him to that degree, whether he was — he wasn’t incoherent, he responded to conversation and so forth, Mr. Woodard did.
 

 “Q. You said a moment ago you could tell he had been drinking and he had sobered up somewhat. Is that what you meant to say?
 

 “A. Yeah. He wasn’t obnoxious or anything, he was calm and cooperative.
 

 «
 
 4c * *
 

 “Q. Did you or Mr. Roy tell Mr. Woodard what he was charged with or that he had been charged?
 

 “A. I did not.
 

 “Q. Did Mr. Roy tell him?
 

 “A.
 
 Not that I recall. I couldn’t say.
 

 “Q. You didn’t tell him that he had been charged at all or that he was going to be charged or anything of that nature?
 

 “A. No, not prior to that.
 

 “Q. Did either you or Mr. Roy tell him what offense you all were interrogating him about?
 

 “A.
 
 Yes.
 

 “Q. What offense did you tell him you were interrogating him about ?
 

 “A. I told him we were interrogating him — I didn’t say interrogating, but we wanted to find our what happened at the Pelican Club.
 

 “Q. But you didn’t mention any offense, anything like murder or manslaughter or negligent homicide or assault
 
 *126
 
 and battery, battery, or anything like that did you?
 

 “A. No, I didn’t know what it was at the time.
 

 “
 
 * * *
 

 “Q. Did either you or Mr. Roy ever tell either — or anybody else to your knowledge, tell either Mr. Woodard or Mr. Hopper that they had the right and privilege of using the telephone or the right and privilege to send a messenger for the purpose of communicating with an attorney or that of communicating with their friends, their relatives, for the purpose of securing an attorney?
 

 “A. No, I just gave them a gist of their rights and had they been illiterates I might have gone into detail but college students, I—
 

 “Q. The reason you didn’t go into detail was because they were college students ?
 

 “A.
 
 Intelligent boys. That no one was taking advantage of them, we tried to make them understand that.
 

 tt
 
 ijc * *
 

 “Q. Now getting back to the statement that you got from Mr. Woodard, did you write that out in your own handwriting?
 

 “A. I did.
 

 “
 
 * *
 
 *
 

 “Q. Now, this statement is not a signed statement is it?
 

 “A. No, it isn’t.
 

 “Q. Can you tell me why it was not signed ?
 

 “A. I read the statement or notes that I took, I read them back to him and I again advised him of his rights, that you are not required to sign this and he said ‘well, I don’t want to sign it’ I said T prefer you didn’t sign it.’
 

 “Q. Did he say that there were some things that were wrong in what you read back to him?
 

 “A. When I read it back to him I asked him if in essence that was correct statement, he said yes, but he didn’t want to sign it. I told him I prefer that he didn’t sign it.
 

 “Q. Why would you prefer that he did not sign it?
 

 “A. Because that wasn’t his exact words.
 

 “Q. Is that same thing true insofar as the statement of Hopper is concerned?
 

 “A. Right.
 

 “Q. Neither one of them are their exact words.
 

 “A. That’s right.
 

 “ * * *
 

 “Q. Are you saying that the only question then that — questions then that you asked them was regard to their names, ages, addresses and then asked them to tell you what happened?
 

 
 *128
 
 “A. No, I wouldn’t confine it to that. No. But they led in conversation, both of them. They were very cooperative and they tried the best they could to tell what happened.
 

 “Q.
 
 Did you tell either one of them or anyone tell either one of them in your presence that these statements were being obtained from them to determine whether or not charges would be filed against them ?
 

 “A.
 
 No, I don’t recall telling them that. The only thing I told them that if they did give a statement it could be used against them in a Court of law.”
 

 Defendant Hopper was interrogated by Major Henderson following the interrogation of Woodard, his interrogation being concluded before 8:30 A.M., April 19, 1964; Dr. Kaufman, Coroner, and Chief Paul Dubea were present. Henderson testified that Hopper appeared to be more intoxicated than Woodard and had a cut on his ear, but that he did not receive medical treatment before interrogation. Henderson said, “I told Mr. Hopper that he didn’t have to give a statement that he didn’t have to say anything, that he was entitled to an attorney, then if he did make a statement it could be used against him in a court of law.” He also said that he told Hopper practically the same thing that was told to Woodard, and, as stated supra, Hopper refused to sign the statement after it was read back to him.
 

 Defendants’ testimony is to the effect that they were not mistreated before or during the interrogation. Their testimony is affirmative to the effect that they were not advised of any of their alleged rights before their interrogation. Woodard said that he was beginning to sober up before interrogation ; Hopper stated that he did not feel well. Defendants’ testimony is in direct conflict with that of Major Henderson, insofar as the information given them before interrogation is concerned. Their testimony reflects that they had never been in previous trouble; they had never had any association with police interrogation. Both defendants testified that the statements were not correct and they refused to sign them. They affirm Major Henderson with respect to the events that transpired after interrogation. Both defendants testified that after interrogation they were told that they could use the telephone, and they did thereupon call their parents.
 

 Sheriff F. O. Didier testified that he had a brief talk with the defendants before the interrogation; he did not advise them of any of their alleged rights. He said that the defendants were booked with murder on the morning of April 19, 1964.
 

 Dr. Henry J. Kaufman, Jr., Coroner for Avoyelles Parish, testified that he was present throughout the interrogation of Hopper. He said that Major Henderson told Hopper that what he said could be used against him. He confirmed that Hopper
 
 *130
 
 said lie did not want to sign the statement— “until he was advised for it.” However, it was his opinion that Hopper did not deny what was in the statement. As far as he could see, the boys did not appear to be drunk.
 

 Chief Dubea affirmed that he was present at the questioning of Woodard. He indicated that nothing was said to either of the defendants with respect to using the telephone until after his interrogation had been completed. He also indicated that they were not told anything with respect to their alleged right to call a lawyer before interrogation. He affirmed that Major Henderson informed them before interrogation that they did not have to make any statement, and that they did not have to answer any questions at all, having an absolute right not to answer questions; that they were also apprised that what they said would be used against them, and they did not have to sign the statements.
 

 Deputy Hebert Bordelon of the Sheriff’s office testified that he recalled that Major Henderson took a statement from Woodard. He said that he thought the District Attorney told Woodard that he had a right to have a lawyer present while he was making his statement. He said he was present when Major Henderson gave Woodard the statement to read and when Woodard refused to sign it; that Woodard was, advised by Major Henderson that he did not have to sign it.
 

 The instant crime is alleged to have been committed on April 19, 1964. A true bill was returned by the Avoyelles Parish Grand Jury on May 22, 1964. On February 12, 1965, the trial of this cause was assigned for Monday, March 1, 1965, all preliminary pleadings or motions to be filed on or before February 16, 1965. On February 26, 1965, a motion for continuance filed on behalf of the defendants was granted: The Motion to Suppress Evidence was overruled on June 19, 1965. Trial began on June 21, 1965; the jury rendered its verdict on July 16, 1965, and sentence was imposed on August 19, 1965.
 

 In Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, (argued April 29, 1964, decided June 22, 1964), the United States Supreme Court held:
 

 “We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements,
 
 the suspect has requested and been denied an opportunity to consult with his lawyer,
 
 and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied ‘the Assistance of Counsel’ in violation of the Sixth Amendment to the Constitution as “made obligatory upon the States by
 
 *132
 
 the Fourteenth Amendment.’ Gideon v. Wainwright, 372 U.S. 335, at 342, 83 S.Ct. 792, at 795, 9 L.Ed.2d 799 and that no statement elicited by the police during the interrogation may be used against him at a criminal trial.” (Emphasis ours.)
 

 On June 13, 1966, the United States Supreme Court rendered its decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, in which it held:
 

 “An individual need not make a preinterrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given. *
 
 %
 
 *
 

 (C
 
 ifc SJí i{< ^
 

 “Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been ¿ware of this right will suffice 'to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right.”
 

 After Miranda, there followed the case of Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, decided June 20, 1966, in which the Court stated:
 

 “In this case we are called upon to determine whether Escobedo v. State of Illinois, * * * and Miranda v. State of Arizona, * * * should be applied retroactively. We hold that
 
 Escobedo
 
 affects only those cases in which the trial began after June 22, 1964, the date of that decision. We hold further that
 
 Miranda
 
 applies only to cases in which the trial began after the date of our decision one week ago. * * * ”
 

 In overruling the Motion to Suppress Evidence in the instant case, the trial judge stated:
 

 “As the Court can see it at this time in the Motion to Suppress, is couched in very general and vague terms and it would be very all inclusive if taken at the recitation therein. But on the basis of what is now before the Court, it can see only one item or perhaps I should say two items which would be at the present before the Court and that is the statement, a separate statement by each of the defendants herein. At this stage of the game, that is all that the Court can see that would be raised by the Motion to Suppress. I believe that’s all, I read it
 
 *134
 
 again recently but I can’t—and any
 
 other
 
 matters that might sought to be introduced, we would just have to wait until we get to them.
 

 “On the statements themselves and considering all of the surrounding circumstances, together with the education and intelligence of the boys, the Court feels that it cannot allow the Motion to Suppress and that the statements would be admissible in evidence.”
 

 We find that the ruling of the trial judge was correct. As stated supra, this case was tried and concluded during 1965, at which time Miranda, supra, had not been decided. Escobedo applies. See, State v. Johnson, 249 La. 950, 192 So.2d 135; State v. Carter, 248 La. 730, 181 So.2d 763.
 

 The evidence supra does not reflect that defendant ever requested counsel or the right to secure same; neither have they shown that their counsel were present during the interrogation and their services denied them. The evidence supra does not show that defendants requested the use of the telephone and were denied .such use. Therefore, the rights afforded defendants with respect to booking, conferring with counsel, confinement, the use of the telephone, and messenger service, set forth in LSA-R.S. 15 :77 (now Articles 228, 229, and 230 of the new Code of Criminal Procedure) and the decisions of the United States Supreme Court in 1965, were not violated.
 

 The allegations with respect to violations of LSA-R.S. 15 :80, 81, 82, booking and being taken before a committing magistrate, are without merit. Under the facts as shown supra, defendants were booked within twelve hours after their arrest; they were indicted by the Grand Jury of Avoyelles Parish on May 22, 1964 and thereafter ordered to be held without bail. Their confinement was therefore at all times legal confinement. See, State v. Johnson, 249 La. 950, 192 So.2d 135.
 

 Having concluded that the ruling of the trial judge was correct in denying the Motion to Suppress Evidence, we are also constrained to conclude that the unsigned oral statements of the defendants were admissible in evidence, as held by the trial judge, and that no constitutional rights of the defendants were violated by their admission. The jurisprudence relied on by counsel for the defendants is not apposite.
 

 Bill of Exceptions No. 5 is without merit.
 

 Bills of Exceptions Nos. 6 and 7 were reserved to the overruling of defendants’ motions for severance,
 

 In his motion for severance, defendant Woodard contended that his defenses were antagonistic to, inconsistent and contradictory with those of John T. Hopper, his co-defendant. He alleged that his co-defendant made a statement outside of his presence which the State would use against him. De
 
 *136
 
 fendant Hopper made the same allegations with respect to his co-defendant Woodard.
 

 Counsel contended that since the unsigned oral statements of the defendants, supra, were admitted in evidence, the severance should be granted. It was contended that in each statement one defendant implicated the other, and that a joint trial was not feasible.
 

 “According to the law of this state and the overwhelming jurisprudence thereunder, an accused is not entitled to a severance as a matter of right and the granting or refusal of his motion therefor is one that rests entirely within the discretion of the trial judge, his ruling remaining undisturbed unless it is established to be arbitrary by the accused. Article 316 of the Code of Criminal Procedure
 
 [7]
 
 * * State v. Faciane, 233 La. 1028, 99 So.2d 333; State v. Mack, 243 La. 369, 144 So.2d 363, cert. denied, 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed.2d 416.
 

 The reasons set out by counsel for the defendants for the granting of severance were general. At the time the motions were filed, defendants did not show any particular reason for granting severance or that injury would result to either from a joint trial. They did not show with particularity that their defenses were antagonistic; they did not show that their testimony would be contradictory. See, State v. Progue, 243 La. 337, 144 So.2d 352. They did not meet the tests which would necessitate severance. See, LSA-R.S. 15:316-317.
 

 We find no abuse of discretion by the trial judge. His charge to the jury adequately protected each defendant.
 
 [8]
 
 We do not find (and it has not been shown) that either defendant was arbitrarily affected by the ruling of the trial judge, or that either
 
 *138
 
 actually suffered any prejudice from the joint trial itself,
 

 Bills of Exceptions Nos. 6 and 7 are without merit.
 

 Bills of Exceptions Nos. 8 and 9 were reserved when the trial judge overruled defendants’ motions requesting that they have a private trial instead of a public one, and that the prospective petit jurors on their voir dire be questioned separately and out of the presence of each other.
 

 The basis of defendants’ motions was that the alleged attitude of the community was to the effect that undoubtedly its good name had been besmirched, and that undoubtedly such attitude would not be conducive to a fair and impartial trial. Defendants also felt that a prospective juror might say one thing privately and another publicly.
 

 A reading of the record discloses that defendants have not shown that they suffered prejudice from a public trial; neither does it reflect that any untruths were told by the prospective petit jurors on their voir dire. It does not appear that a motion for change of venue was filed. Under such circumstances, we do not find that the trial judge abused his discretion in directing that the trial of the defendants be public.
 

 Bills of Exceptions Nos. 8 and 9 are without merit.
 

 Bill of Exceptions No. 10 was reserved when the trial judge sustained the State’s challenge for cause of the prospective juror Rudolph Paul Gremillion.
 

 We find that the ruling of the trial judge was correct; his per curiam clearly expresses his reasons as follows:
 

 “The facts stated in the bill, with reference to the pending charge against Rudolph Gremillion, are generally correct. He said he had been arrested and had furnished a bail bond in another parish, Pointe Coupee. He had never been called for trial and had not paid a fine.
 

 “The Sheriff who reported there was no charge pending against Gremillion was the Avoyelles Sheriff. He said he had called the New Roads, or Pointe Coupee Sheriff. The Court realized that whether a formal charge by bill of indictment or bill of information was actually filed, in the process of grand jury proceedings, or district attorney’s investigation, were matters which the Avoyelles Parish Sheriff could not give to the Court with any certainty. It was hearsay from another sheriff, by telephone conversation or radio communication. The Court could not take a chance. The prospective juror was excused. Had he been accepted, these same attorneys would be arguing to the Court now, that this juror was incompetent; he had a criminal charge against him; he was under bond
 
 *140
 
 at the time and the matter had never been disposed of. The Court can see no prejudice or wrong to the defendants. They are not entitled to particular jurors; only to a fair and impartial jury. This they had; there is no question about it. It is not contended otherwise by the defendants themselves. They have a right to reject obnoxious jurors or challenge them for cause. The Court feels there was no harm or wrong done to the defendants by excusing this juror.”
 

 Bill of Exceptions No. 10 is without merit.
 

 Bill of Exceptions No. 11 was reserved when the trial judge denied the peremptory challenge of defendant Woodard to the prospective juror V. J. Rabalais, such challenge being his thirteenth peremptory challenge.
 

 Counsel for defendants contend that at the time they were refused severance, it was impossible and impracticable for counsel to divorce themselves from either defendant; therefore, the same counsel represented both defendants. They argue that the peremptory challenges used by one defendant should have had no effect on the challenges used by the other defendant. They further argue that under the decisions of this Court, in State v. Breedlove, 199 La. 965,
 
 7
 
 So.2d 221, and in State v. Oliphant, 220 La. 489, 56 So.2d 846, the ruling of the trial judge in connection with the situation reflected by this Bill of Exceptions constitutes prejudicial and reversible error. They also rely on the case of State v. Sevin, 243 La. 1023, 150 So.2d 1, as sustaining their contention.
 

 The trial judge in his per curiam to the instant bill stated:
 

 “Mr. Gravel was chief counsel for both defendants. As he excused [sic] his peremptory challenges, he would state that it was on the part of the defendant, Mr. Woodard. After he had used twelve (12) peremptory challenges on behalf of Mr. Woodard, he sought to excuse Mr. V. J. Rabalais, peremptorily, on behalf of Mr. Woodard. He had exhausted his peremptory challenges at that time, for this defendant. But he could have excused him peremptorily on behalf of Mr. Hopper, the other defendant. He did not do so. Instead, he accepted him 'at the request of Mr. Hopper.’
 

 “If Rabalais was an obnoxious juror, Mr. Gravel could have excused him, peremptorily, on behalf of Mr. Hopper, who still had at that time eleven (11) unused peremptory challenges and who never did exhaust his peremptory challenges. Mr. Gravel represented both defendants and they were being jointly tried. He was blowing hot and cold, at the same time, as counsel for both. One of my defendants does not want him; the other wants him, so I’ll accept him. And I say all this to you, Judge, in the absence
 
 *142
 
 of the particular juror involved, who was outside the Courtroom at the time.”
 

 LSA-R.S. 15:354 (now Art.
 
 799
 
 of the new Code of Criminal Procedure) provided :
 

 “In all trials for any crime punishable with death, or necessarily with imprisonment at hard labor, each defendant shall be entitled to challenge peremptorily twelve jurors, and the prosecution twelve for each defendant. * * * ”
 

 LSA-R.S. 15:353 (now Art. 800 of the new Code of Criminal Procedure) provided :
 

 “No defendant can complain of any ruling sustaining or refusing to sustain a challenge for cause, unless his peremptory challenges shall have been exhausted before the completion of the panel; moreover, the erroneous allowance of challenges for cause affords the defendant no ground of complaint, unless the effect of such ruling is the exercise by the prosecution of more peremptory challenges than it is entitled to by law, or unless the defendant by such ruling is forced to accept an obnoxious juror.”
 

 In State v. Sevin, supra, this Court stated:
 

 “The right of an accused to peremptory challenges of prospective jurors who are to try him is guaranteed by the constitution of our State. LSA-Const. art. 1, § 10. * * * This court recognizes that an erroneous ruling of the court, which deprives a defendant of one of his peremptory challenges is a substantial violation of his constitutional right to a fair trial and requires reversal. * * * ”
 

 In State v. Breedlove, supra, this Court held that where the trial judge erroneously refused to sustain defendant’s challenge to prospective juror for cause, and thereafter defendant exhausted his peremptory challenges, but made no showing that any occasion arose after exhaustion of peremptory challenges when defendant needed a peremptory challenge or would have used it against any of the remaining jurors of the panel, there was no reversible error.
 

 In State v. Oliphant, supra, this Court held that when an accused, by an erroneous ruling of the trial judge, is deprived of one of his twelve peremptory challenges to prospective jurors, the ruling of the court constitutes a real and substantial violation of the constitutional or statutory rights of the defendant.
 

 LSA-R.S. 15:354, supra (substantially the same in the new Code of Criminal Procedure), means that each defendant, though jointly tried, is entitled to challenge twelve jurors. State v. Sevin, supra. Herein, defendant Woodard exercised his twelve peremptory challenges before challenging Mr. Rabalais. In challenging’ Mr. Rabalais, Woodard’s counsel contended that he was objectionable and obnoxious. When the
 
 *144
 
 bill was reserved, counsel did not show how Mr. Rabalais was obnoxious; he does not show herein how he was obnoxious. Counsel does not show this Court where defendant Woodard suffered any prejudice from Mr. Rabalais’s serving on the jury which heard this prosecution. Under such circumstances, we cannot hold that defendant was forced to accept an obnoxious juror or suffered prejudice. Therefore, having exhausted his peremptory challenges, he was not entitled to exercise a thirteenth challenge with respect to Mr. Rabalais.
 

 Bill of Exceptions No. 11 is without merit.
 

 Bill of Exceptions No. 12 was reserved to the trial court’s overruling defendant’s objection to the peremptory challenge by the State of the prospective juror Alton Tassin.
 

 Defense counsel contend that the ruling was a retraction by the court of a prior ruling on an agreement among defense counsel, the District Attorney, and the court. Counsel contend that the allowing 'of the challenge was irregular and should not have been allowed.
 

 Although previous to the challenging of Mr. Tassin there had been an agreement among defense counsel, the District Attorney, and the court, indicating that once a prospective juror had been accepted by both the State and defense counsel, there would be no further questioning of the prospective juror’s qualifications, the action of the trial judge was in strict accordance with LSA-R.S. IS :359,
 
 [9]
 
 which was mentioned in the agreement.
 

 We find no abuse of discretion by the trial judge in allowing the peremptory challenge of this prospective juror;
 
 [10]
 
 likewise, we find that defendants suffered.no prejudice.
 

 Bill of Exceptions No. 12 is without merit.
 

 Bill of Exceptions No. 13 was reserved when the trial judge overruled defense counsel’s objection to the excusing of the prospective juror Alex Wyble, who
 
 *146
 
 had previously been accepted by both the State and the defendants.
 

 This prospective juror testified on June 26, 1965 that he had never been arrested for anything so small as a traffic ticket, and he was accepted as a juror by both the State and the defendants. The court then informed counsel that it would take no action on this juror at that time, because it had been informed that he had previously been given an arrest ticket by the State Police. On June 28, 1965, the District Attorney informed the court that there was a traffic violation pending against Alex Wyble, and that an original bill had been signed by him that day. The trial court then excused this prospective juror.
 

 We find that the actions of the District Attorney were irregular, but, despite this fact, the ruling of the trial judge was correct and in accordance with LSA-R.S. 15¡172,
 
 [11]
 
 which vests him with discretion in matters such as those presented in this bill.
 

 Bill of Exceptions No. 13 is without merit.
 

 Bill of Exceptions No. 14 was reserved to the ruling of the trial judge denying defendant Woodard’s challenge for cause of the prospective juror Alvin Coco.
 

 Defendant Woodard, who had exhausted his peremptory challenges, contended that because the prospective juror had in the past, engaged the services of the law firm of Roy and Roy, of which Chris Roy, associate counsel with the District Attorney herein, was a member, and because a close friendship existed between Chris Roy and the prospective juror, he could not render a fair and impartial verdict. See, LSA-R.S. 15:351.
 

 This prospective juror testified that his relationship to the law firm of Roy and Roy, as well as his friendship with Chris Roy, would have no effect on his decision in the prosecution. Under these facts, we find no abuse of discretion by the trial
 
 *148
 
 judge "in denying defendant Woodard’s challenge for cause.
 
 [12]
 

 Bill of Exceptions No. 14 is without merit.
 

 Bill of Exceptions No. 15 was reserved when the trial judge denied defense counsel’s challenge for cause of the prospective juror Michael Scanlon.
 

 The prospective juror testified that he knew the mother of the victim, having been in her company four or five times, but that he had not seen her since her son’s death. He also testified that he knew the father of Gary Morrison, a witness for the State. Despite his relations with these two persons, he was of the opinion that he could make a fair decision. He said, “I would say this, I don’t think it would have any influence on me but if I was the boys I don’t think I’d want me.”
 

 We do not find that the trial judge abused his discretion in denying the challenge at the time he did. We note that later (after the challenge was denied and more testimony had been adduced), when counsel for the defendants excused the prospective juror Michael Scanlon, the trial court also excused him. The instant jury does not bear the name of Scanlon. Therefore, defendants suffered no prejudice; their constitutional rights were not violated, and the action of the trial judge was not arbitrary in any manner.
 

 Bill of Exceptions No. 15 is without merit.
 

 Bill of Exceptions No. 16 was reserved when the trial court denied defense counsel’s challenge for cause of the prospective juror Murkle Dupuy.
 

 The prospective juror testified that he went to the Pelican Club quite regularly and had been there on the night of April 18, 1964, leaving around twelve o’clock. He had no definite recollection of seeing the defendants. He testified that despite his attendance at the Club, he could render a fair and impartial decision in the prosecution.
 

 Defense counsel contended that this prospective juror’s attendance at the Club could have a mental effect upon his decision, particularly if there were witnesses in the' case who had also been in attendance.
 

 We find.no abuse of the trial court’s discretion in refusing to excuse the prospective juror for cause, but we also note that he was excused when defense counsel exercised a peremptory challenge for defendant Hopper. Under the circumstances, the defendants suffered no prejudice.
 

 Bill of Exceptions No. 16 is without merit.
 

 
 *150
 
 Bills of Exceptions Nos. 17, 18 and 19 - were reserved to the refusal of the trial judge to order the State to furnish the defendants with certain desired particulars requested in motion and supplemental motion for particulars.
 

 The record reveals that a motion for bill of particulars was filed by defense counsel, and that thereafter several supplemental motions were filed. In response to the motions, the trial court ordered that defendants be furnished certain information. They were given copies of Major Henderson’s notes taken during the oral interrogation of defendants, supra, and were given a statement made by Cyrus Frazier. They were told that, “the only confessions and/or statements and/or admissions made by defendants to various deputies and/or other persons, were oral and not recorded electronically; that the State does have notes written by Harold Henderson of the Avoyelles Parish Sheriff’s Department; that the defendants are not entitled to the names and addresses of persons to whom any such confessions, and/or statements and/or admissions were made, nor to the names and addresses of the witnesses to said confessions, and/or admissions and statements.” They were also told that no warrant had issued for their arrest; they were not given all information leading to their arrest; they were not given the names of witnesses to be called by the State; and they were not informed of the evidence presented to the grand jury which indicted them.
 

 Defense counsel contend that by not being given all of the particulars requested, defendants suffered prejudice and were denied their constitutional rights.
 

 LSA-R.S. 15 :215 (now Articles 433-434 of the new Code of Criminal Procedure) -provided that the sessions of the' grand jury should be secret. Therefore, whatever information was submitted to the grand jury which indicted the defendants is a matter of secrecy between the District Attorney and the grand jury. Defendants were not entitled to know what evidence was submitted to the grand jury which investigated the instant offense, nor were they entitled to know what evidence was in the possession of certain Parish or State officials and submitted to the investigating grand jury.
 

 “The proper function os a bill of particulars is to inform the accused in greater detail of the nature of the crime of which he is charged. Articles 235 and 288 of the Code of Criminal Procedure. * * * That it may be used as a device for ascertaining the nature of the evidence produced at the hearing of the grand jury is certainly a novel proposition and one unsupported by authority. * * * ” State v. Simpson, 216 La. 212, 43 So.2d 585, cert. denied, 339 U.S. 929, 70 S.Ct. 625, 90 L.Ed. 1350.
 

 
 *152
 
 A reading of the motions for bill of particulars and the supplemental motions, as well as the State’s answers to such, constrains us to find that the State was not required to furnish any more information than it did with respect to the probable cause of defendants’ arrest. Present jurisprudence does not compel the State to reveal the sources of all information within its knowledge. McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62; State v. Hunter, 250 La. 295, 195 So.2d 273.
 

 Defense counsel were not entitled to have a list of the State’s witnesses. State v. Jones, 249 La. 324, 186 So.2d 608. The fact that the defense might be surprised by the appearance of a particular witness does not mean that the name of such witness must be submitted to counsel prior to trial. We know of no law to the contrary.
 

 The oral statements and other evidence within the State’s possession were not such as had to be revealed in answer to a motion for a bill of particulars. See, State v. Pailet, 246 La. 483, 165 So.2d 294. The function of the bill of particulars is to inform the accused concerning matters which are pertinent to the charge against him. The trial court in its discretion determines what is fair to the accused in ordering the State to reveal that which the defendant will need to defend himself. The accused, however, is not entitled to the evidence upon which the State relies to establish its case. State v. Bourg, 248 La. 844, 182 So.2d 510; State v. Barksdale, 247 La. 198, 170 So.2d 374, cert. denied, 382 U.S. 921, 86 S.Ct. 297, 15 L.Ed.2d 236.
 

 We find that defendants suffered no prejudice in not being given all information they desired; their constitutional rights were not violated. They were furnished sufficient details for the preparation of their defense. The trial judge did not abuse his discretion and acted in all fairness to the rights of the accused.
 

 Bills of Exceptions Nos. 17, 18 and 19 are without merit.
 

 Bills of Exceptions Nos. 20, 21, 22, 23, 26, 40 and 48 were reserved to the trial court’s overruling defendants’ objection to the District Attorney testifying as a witness for the State.
 

 The District Attorney’s testimony was with respect to the alleged statements given by the defendants, supra, the identification of certain State’s exhibits, and certain events which took place on the morning of April 19, 1964.
 

 Defense counsel objected to the District Attorney testifying on the ground that it was improper and prejudicial to the rights of the accused for the District Attorney to be both the prosecutor and a material wit
 
 *154
 
 ness in the case. A minor objection was also made to the effect that the testimony of the District Attorney would impeach that of a State witness. Objection was also made that a proper foundation had not been laid for the introduction of certain exhibits.
 

 Under the facts of this prosecution as disclosed by the testimony attached to the bills of exceptions, it was necessary that the District Attorney testify. He had a peculiar knowledge of what took place on the morning the offense was committed. It was really necessary that he testify in order for the defendants to have a fair and impartial trial. A foundation was properly laid for the introduction of exhibits. We also find that the testimony of the District Attorney was explanatory rather than impeaching. With respect to Bill of Exceptions No. 48, we note that the trial judge explicitly told the jury to disregard completely certain testimony which was sought to be elicited in rebuttal.
 

 We find that the trial judge had to exercise his discretion in this matter, and ■under its peculiar facts and circumstances lie was constrained to permit the District Attorney to testify. We do not find that "he abused his discretion. No authority ■which absolutely prohibits a district attorney from testifying in a prosecution which he is conducting has been pointed out to us. Counsel for the defendants have not shown that defendants suffered any prejudice from the testimony of the District Attorney. We find no reversible error.
 

 Bills of Exceptions Nos. 20, 21, 22, 23, 26, 40 and 48 are without merit.
 

 Bills of Exceptions Nos. 24 and 25 were reserved when the trial judge ruled that the proper foundation and predicate had been laid for the introduction in evidence of certain admissions, confessions, or statements allegedly made by the defendants and overruled defendants’ objections to their introduction in evidence.
 

 During the trial of this case, the District Attorney informed the trial court and defense counsel that the State was laying the foundation
 
 to
 
 introduce the following:
 

 1. Oral remarks made by defendant Woodard to Chief Paul Dubea in the presence of Officer DeNux at the Ranch House Motel, as well as any and all remarks made by him en route to the Marksville Parish Courthouse.
 

 2. Any and all remarks, confessions and/or statements made by defendant Hopper to Sergeant Pat Lemoine and Trooper Eddie Bordelon on April 19, 1964.
 

 3. The oral confession and/or admissions and statements made by defendant Woodard to Major Harold Henderson.
 

 4. The oral confession and/or admissions and statements made by the defendant Hopper to Major Harold Henderson.
 

 
 *156
 
 5. The oral confession and/or admissions or statements made by defendant Woodard to District Attorney Anthony J. Roy, Jr., around sunrise April 19, 1964.
 

 6. Oral remarks made by defendant Hopper to Joe Michell, an employee of the Pelican Club.
 

 7.
 
 Oral remarks of a conversation between the defendants and a third party in the Avoyelles Parish Jail on Monday, April 21, 1964; the remarks were overheard by a witness who would later testify, a Reverend Bell.
 

 After the State had laid its foundation for the introduction of the above in evidence and counsel for the defendants had voiced objection, the trial court ruled that from all of the evidence a necessary foundation had been laid for the introduction of four different statements or confessions made by the accused, namely; a statement by defendant Woodard to Chief Paul Dubea; defendant Hopper’s statement to 'Troopers Lemoine and Bordelon; defendant Woodard’s statement to Major'Harold ‘Henderson in the Sheriff’s office; and defendant Hopper’s statement to Major Harold Henderson.
 

 Defendants contend that the admission of the statements, supra, was erroneous because they were obtained and made in violation of the statutory State and Federal Constitutional rights of the accused, particularly but not exclusively LSA-R.S. IS :59, 60,
 
 66, 67, 70, 77,
 
 78, 80, 81, 82 and 142; Art.. I, Sec. 11, La.Const. of 1921; Art. I, Sec. 9, La.Const. of 1921; Art. I, Sec. 2, La. Const, of 1921; the Fourth, Fifth, Sixth,, and Fourteenth Amendments to the United States Constitution. They also submit the same arguments advanced in Bills of Exceptions Nos. 5, 17, 18 and 19. They also-urge that all statements were not given to-them in advance of trial, and that they were entitled to such in order to prepare their defense.
 

 Counsel for the defendants had in their possession for inspection and preparation of their defense the statements given by the-defendants to Major Henderson. The other-statements were not written confessions, and counsel were told in advance of trial' that the State did have certain oral statements which it would attempt to introduce-in evidence.
 

 “In requesting a pre-trial examination: of the wire-tap recordings, defense counsel find themselves confronted with the-well-established rule that all evidence-relating to a pending criminal case which is in possession of the State is privileged; and not subject to inspection by the accused unless and until it is offered in-evidence at the trial. The single exception to this rule has been made in instances where the State has in its possession a written confession of the accused. * * * ” State v. Pailet, 246
 
 *158
 
 La. 483, 165 So.2d 294. See, State v. Dorsey, 207 La. 928, 22 So.2d 273.
 

 A reading of the testimony attached to the instant bills constrains us to find that a proper foundation was laid for the introduction of the statements in evidence, and that their admission was proper after such foundation had been laid. No showing to the contrary has been made. Our reasoning in Bills of Exceptions Nos. 5, 17, 18 and 19 applies to these bills. No further discussion is necessary.
 

 Bills of Exceptions Nos. 24 and 25 are without merit.
 

 Bills of Exceptions Nos. 38 and 39 were reserved when the trial court ruled that the statements made by defendants •could be submitted to the jury.
 

 Defense counsel contended that the proper foundation and predicate for the statements had not been laid, and that their submission to the jury would violate defendants’ constitutional rights.
 

 A review of the testimony attached to the instant bills discloses that Major Henderson testified that he had the notes or -statements in his possession. He provided the court with the originals; his handwriting was identified. He read the statements to the jury and testified that he wrote down as accurately as he could what the ■defendants told him. He said he did not .go beyond the responses of the defendants -in the statements.
 

 “There is no rule in this state requiring the signing of a confession by the accused.
 

 “ ‘A confession is the voluntary declaration made by a person who has committed a crime or misdemeanor, to another, acknowledging his agency or participation in same. * * * A confession may be either express or implied. It may be a naked statement by defendant that he is guilty of the crime, or it may be a full statement of the circumstances of its commission, including his part in it. Also it may be in the form of a letter or of several letters to different persons, or may consist of detached conversations with many people, or it may be a formal confession, or all of these together.’ 16 Corpus Juris, 715, verbo ‘Criminal Law,’ and authorities cited in foot-notes.” State v. Eisenhardt, 185 La. 308, 169 So. 417, cert. denied, 299 U.S. 512, 57 S.Ct. 49, 81 L.Ed. 378. See, State v. Dierlamm, 189 La. 544, 180 So. 135,
 

 Our discussion of Bill of Exceptions No. 5 also applies to these bills. Therefore having found that the Motion to Suppress Evidence was properly overruled by the trial judge, we conclude that his rulings permitting the State to submit the statements of the defendants to the jury were correct.
 

 Bills of Exceptions Nos. 38 and 39 are without merit.
 

 Bill of Exceptions No. 27 was reserved when the trial judge ruled that the State
 
 *160
 
 during trial could go into the actual contents of the statements made by the defendants to Maj.or Henderson.
 

 Counsel for defendants contended that a proper foundation had not been laid for the introduction of the statements, and that the corpus delicti had not been proved. Counsel urged that the trial judge’s ruling violated defendants’ constitutional rights.
 

 The instant bill really presents nothing new for our consideration. Our discussion of Bills of Exceptions Nos. 5, 24, 25, 38 and 39 applies to this bill. No further discussion is necessary.
 

 Bill of Exceptions No. 27 is without merit.
 

 Bill of Exceptions No. 28 was reserved when the trial judge denied the request of defendants’ counsel for the sequestration of certain attorneys who had been subpoenaed by defense counsel.
 

 Some of the attorneys represented Mrs. Althea Duncan, the mother of the victim of the instant crime, in her civil suit against the defendants and the father of defendant Woodard. One of the attorneys addressed the trial court and stated:
 

 “Now, we appeal to Your Honor to use your discretion in allowing us to remain in the Courtroom because there is no conceivable purpose in Mr. Gravel calling us as witnesses for the defendants. If we were called to give testimony in this case it would be prejudicial to the defendants, further, if we were called as. witnesses for the defense, we would claim the privilege existing between attorney and client provided in R.S. 15 :475, which would prohibit us from giving any testimony in this case about our knowledge of the case which we gained while we were working for Mrs. Duncan.”
 

 This attorney also stated that the District Attorney had no objection to the attorneys, being in the courtroom.
 

 A reading of the colloquy among the trial court, counsel in this case, and the attorneys discloses that when the trial judge-permitted the attorneys to remain in the-courtroom, he gave them proper admonition as to what they might discuss with other persons. Under LSA-R.S. 15:371,. the trial judge was vested with discretion to-order or refuse to order the sequestration of witnesses. Counsel for the defendants, have not shown that defendants suffered any'prejudice from the denial of sequestration by the trial judge. Under such circumstances, we do not find that the trial' judge abused his discretion.
 

 Bill of Exceptions No. 28 is without merit.
 

 Bill of Exceptions No. 29 was reserved; when the trial court allowed the State’s. Exhibits 1-TB through and including 6— TB to be admitted and filed in evidence.
 

 
 *162
 
 The testimony attached to the instant bill reflects that Dr. John Maxwell of Alexandria, a specialist in pathology, performed the autopsy on the instant victim on April 19, 1964, acting at the request of Dr. Henry J. Kaufman, Jr., Coroner of Avoyelles Parish. To better orient himself and for a diagnosis pertaining to the cause of death, Dr. Maxwell made pictures of the autopsy. He took color picture slides, which were later developed into photographs.
 

 State’s Exhibits 1-TB through 6-TB consist of: 1) a picture slide of a full face view of Joseph Ralph Beeson; 2) a picture slide of the right side of the head of Joseph Ralph Beeson; 3) a picture of the left side of the head of Joseph Ralph Beeson; 4) a picture slide of the under side of the brain of Joseph Ralph Beeson; 5) a picture slide of the floor of the skull of Joseph Ralph Beeson; and 6) a picture slide of both lungs of Joseph Ralph Beeson.
 

 Counsel for the defendants objected to the offering of the slides in evidence for these reasons:
 

 (1) Proper foundation for their introduction had not been laid;
 

 (2) There was no predicate established that would permit the purported offerings to be received in evidence;
 

 (3) They were taken at a time too remote to be relevant or material or of any probative value;
 

 (4) They were not necessary or material to any issue or fact involved in this case at that time;
 

 (5) They were gruesome, ghastly, shocking, emotionally disturbing and were prejudicial, if received in evidence and viewed by the jury, to the rights of the defendants;
 

 (6)There was no dispute as to the cause of death; counsel had stipulated:- — ■ “Defense wishes to stipulate that Ralph Beeson died in the early morning hours of April 19, 1964; that his death resulted from trauma to the brain incidental to and attendant to a basal fracture of the skull.”
 

 (7) That the autopsy and what was revealed thereby was not the handiwork of either defendant, but the handiwork and professional handiwork as a result of Dr. Maxwell;
 

 (8) That there was no probative value that could be attached to the offerings.
 

 The trial court viewed the slides and then permitted the jury to view them projected on a screen. The court stated:
 

 “The projection of films or slides identified by the witness [Dr. Maxwell] on the screen which is hereby the Court, the Court believes that such films or slides would be admissible in evidence as factual and pictorial data to support the testimony and expert conclusions of the witness.”
 

 
 *164
 
 A review of the evidence attached to the Instant bill reflects that a proper foundation was laid for the introduction of the slides, and that a predicate was established for their offering. The slides were made on the day of death, not at a remote time, and were relevant to the prosecution. They were relevant to the theory of the State and to the admission of counsel for the defendants that the victim’s death resulted from trauma to the brain.
 

 The objection that the slides were gruesome and would have the effect of prejudicing the minds of the jury has no merit. The slides were all associated with the cause of the victim’s death and reflected the injuries he allegedly received. State v. Dowdy, 217 La. 773, 47 So.2d 496. The fact that objects or photographs constitute or portray a repulsive spectacle and tend to prejudice the jury furnishes no valid ground for their exclusion where they are otherwise relevant. State v. Hamilton, 249 La. 392, 187 So.2d 417.
 

 The trial judge correctly ruled that the slides were admissible to substantiate the testimony of the witness Dr. John Maxwell.
 

 Bill of Exceptions No. 29 is without merit.
 

 Bills of Exceptions Nos. 30 ond 31 were reserved when the trial court denied the request of defense counsel for the production in evidence and view by counsel of the photographs made from the slides identified as State’s Exhibits 1-TB through 6-TB.
 

 It goes without saying that before the photographs were produced (they were later produced), the slides from which they were made had to be introduced in evidence and testimony given with respect thereto. This was a phase of the prosecution when the trial court denied counsel’s request. The request of counsel was therefore premature. No prejudice has been shown, and defendants suffered no prejudice.
 

 Bills of Exceptions Nos. 30 and 31 are without merit.
 

 Bill of Exceptions No. 32 was reserved when the trial court permitted the photographic prints of the color slides, State Trial Exhibits 1-TB through 6-TB, to be admitted in evidence.
 

 Defense counsel submitted as their objection to the admission of the photographic prints, the same reasons advanced in Bill of Exceptions No. 29 as objection to the admissibility of the color slides.
 

 We have viewed the photographs submitted to this Court as a part of the evidence, and we do not find that they are gruesome, morbid, or of any other character as would prejudice the jury. State v. Fulghum, 242 La, 767, 138 So.2d 569. They are relevant to the prosecution of this case and
 
 *166
 
 are evidentiary to the alleged cause of death. Our discussion of Bill of Exceptions No. 29 applies to the instant bill.
 

 Bill of Exceptions No. 32 is without merit.
 

 Bills of Exceptions Nos. 33 and 34 were reserved when the trial court permitted the State to offer in evidence mug photographs of the defendants, State Trial Exhibits Nos. 3 and 4, and testimony concerning same.
 

 Defense counsel contended that the ruling of the trial judge permitting the photographs to be offered in evidence and allowing Deputy Sheriff Allen Normand to testify with respect to same violated defendants’ statutory and constitutional rights.
 

 Allen Normand was Chief Identification Officer in charge of records at the time of trial; his duties included fingerprinting, mugging, keeping records, and identifying evidence. He was also president of the Louisiana Association of Identification. The officer identified the pictures of the defendants, testifying that he mugged the defendants at the same time he fingerprinted them. He testified from notes as to the physical qualities of the defendants. We find that he was well qualified to give the testimony that he did, and that such testimony was relevant to the instant prosecution.
 

 “We do not think that permitting the coroner to testify as to his findings upon the physical examination' made of the accused or the admission in evidence of pictures of the accused denied him due process of law simply because the examination was made and the pictures were taken while he was in custody of the police and without counsel. We know of no provision of the law which requires the consent of the person arrested and charged with a crime for these things to be done. Neither the testimony of the-coroner nor the admission in evidence of the pictures violated defendant’s constitutional privilege against compulsory self-incrimination. * * * ” State v. Hughes, 244 La. 774, 154 So.2d 395.
 

 We do not find that the trial judge abused his discretion by admitting the mug shots in evidence. They were relevant evidence and therefore admissible.
 

 Bills of Exceptions Nos. 33 and 34 are without merit.
 

 Bills of Exceptions Nos. 35 and 36 were reserved when the trial judge allowed the State to introduce in evidence the shoes worn by the defendants on April 18th and 19th, 1964, State Trial Exhibits Nos. 5, 6, 7 and 8.
 

 Defense counsel contended that the State had not laid the proper foundation and predicate for the introduction of the exhibits, and that they were irrelevant and immaterial and of no probative value. Counsel also objected for the same reasons
 
 *168
 
 advanced in Bills of Exceptions Nos. 33 and 34.
 

 Deputy Allen Normand properly identified the shoes and testified that they had been in his possession, having been turned over to him by defendants at the time of fingerprinting. Under the circumstances, we find that the proper foundation was laid for the introduction of the shoes in evidence. They were relevant evidence and therefore admissible. State v. Aspara, 113 La. 940, 37 So. 883.
 

 Bills of Exceptions Nos. 35 and 36 are without merit.
 

 Bill of Exceptions No. 37 was reserved when the trial court allowed the State to introduce in evidence State Trial Exhibit No. 9, a picture of a Model R1205 Panel (Corvan) Truck. 0
 

 Counsel for the defendants contended that the exhibit had not been properly identified, and that the proper foundation had not been laid for its introduction. They also contended that the witness Gary Morrison had not been properly qualified to give testimony to lay the predicate for the introduction of the exhibit. They further contended that the exhibit was irrelevant and immaterial evidence and of no probative value.
 

 The prosecution alleged that at the time of the instant occurrence a truck was near the concrete slab, supra. Gary Morrison, a friend of the deceased who accompanied him to the Pelican Club on the night of April 18, 1964, testified as to the events which took place before the death of Joseph Ralph Beeson; he testified as to the physical surroundings outside of the Pelican Club. We find that it was proper for the State to ask him if the truck he had seen near the slab resembled that portrayed in the picture. The exhibit was relevant 'evidence.
 

 A reading of the testimony attached to the instant bill reflects that a proper foundation was laid for the introduction of State Trial Exhibit No. 9.
 

 Defendants have not shown that they suffered any prejudice from the admission of this exhibit. We'find that it was admissible. State v. Page, 173 La. 279, 136 So. 609.
 

 Bill of Exceptions No. 37 is without merit.
 

 Bill of Exceptions No. 41 was reserved when the trial court permitted the State to introduce in evidence State Trial Exhibits Nos. 22, 23 and 24, color photographs of a cement slab on the side of the Pelican Club.
 

 Defense counsel objected to the introduction of the color photographs on the ground that the offering was made without proper foundation and predicate having been laid. They contended that the photographs had
 
 *170
 
 ■not been identified in such a way as to permit them to have any probative value. Counsel contended further that the slab had been hosed down prior to the taking of the photographs and for that reason they did ■not actually reflect the area because of the •crowd at the scene as testified to by wit-messes. It was still further contended that the exhibits were not of any material or xelevant value, “other than the deceased himself and the situation as reflected at the time that the photographs were taken.”
 

 We find that the photographs were properly identified. They were identified by Deputy Sheriff Allen Normand who took ■the pictures. The reverse side of the ■photographs reflect that they were taken :at 4:00 A.M., April 19, 1964. A proper foundation and predicate was therefore laid for the introduction of the exhibits in ■evidence.
 

 Defendants have not shown that they suffered any prejudice from the introduction of the exhibits. We find that the photographs were relevant evidence, but if not so, they served as secondary evidence. Cf., State v. Palmer, 227 La. 691, 80 So.2d 374.
 

 Bill of Exceptions No. 41 is without merit.
 

 Bill of Exceptions No. 42 was reserved when the trial court permitted the State to offer in evidence State Trial Exhibits Nos. 37, 37-A and 37-B, a paper bag and two drinking glasses.
 

 Counsel for the defendants objected to the introduction of the exhibits on the grounds that the proper foundation had not been laid, proper identification had not been made, and the offering was irrelevant and immaterial and of no probative value.
 

 M. J. Juneau testified that he had worked at the Pelican Club about one and one-half years prior to April 19, 1964. He identified the glasses as being similar to those used at the Club on April 19, 1964.
 

 We find that a proper foundation was laid for the introduction of the exhibits. Defense counsel have not shown that the defendants were prejudiced by the introduction of the exhibits. They merely state that the State was obviously attempting to minimize the effect of Beeson’s striking Hopper with a drinking glass by offering the instant exhibits. If this was so, it was the State’s privilege, and the evidence was relevant.
 

 Bill of Exceptions No. 42 is without merit
 

 Bill of Exceptions No. 43 was reserved when the trial judge, outside of the presence of the jury, ruled that Mrs. Althea Duncan, mother of the victim, could testify in the presence of the jury with respect to a conversation she had with the defendant Hopper in the Sheriff’s office on April 19,
 
 *172
 
 1964. She asked Hoppe'r, “Why ?” Hopper responded, “just drunk.”
 

 Defense counsel contend that the trial judge committed error in permitting Mrs. Duncan to testify as she did, because:
 

 “Obviously, this testimony should not have been allowed for the reason that the entire conversation between the two parties and circumstances related thereto leaves no indication as to what was meant by the remarks, and for the further reason, that if the remark of the defendant as testified to by Mrs. Duncan was intended as an oral admission of any kind, it was not one of the ‘seven areas’ referred to by the District Attorney (see Bill of Exception No. 24). If it was intended to be used as an oral admission then the same objections made by the defendants to the other oral remarks would be applicable here.”
 

 We do not find that the conversation testified to by Mrs. Duncan was intended as an oral admission. Counsel have not shown where the trial judge abused his discretion, and we do not find that he did. Likewise, counsel have not shown how the defendants suffered prejudice by Mrs. Duncan’s relating her conversation with the defendant Hopper.
 

 Bill of Exceptions No. 43 is without merit.
 

 Bills of Exceptions Nos. 44 and 45 were reserved when the trial court denied defendants’ motions for a mistrial.
 

 Billy Frazier, age twenty-one at the time of trial, and a former college roommate of Joe Woodard, who was with the defendants on the night of the instant occurrence, was asked the following questions by the State in the interest of perjury during his testimony:
 

 “Mr. Frazier, let’s get down to it. You remember when you were in that Grand Jury when you were subpoenaed to appear before this Grand Jury last year in April of 1964 — let me ask my question and you can object.”
 

 “Do you remember when you were subpoenaed to appear before this Avoyelles Parish Grand Jury last May of 1964, do you remember that?”
 

 “You remember when you were subpoenaed before the Grand Jury?”
 

 “You remember how long you stayed in the Grand Jury?”
 

 The witness responded that he wasn’t subpoenaed; that “a Policeman up at Tech come and told me to come down here.” The witness then said he remembered when he was subpoenaed. He did not answer the question as to the length of time he remained with the grand jury.
 

 After defense counsel’s objection and colloquy between the court and counsel, Mr. Roy made the following statement:
 

 “Yes, sir, we are in accord with, Your Honor — but the State is interested in'and
 
 *174
 
 the Court is interested in and the Jury is interested perjury and I have a right to ask him as a basis of a foundation to find out what he said in there and he didn’t say what he said — like to lay the foundation for that, Your Honor.”
 

 Thereafter, the trial court ruled that the grand jury proceedings were secret, and that the witness did not have to answer the questions. It stated:
 

 “The Court will instruct the Jury to disregard that statement entirely as you were told before the statements of the attorneys are not evidence and whatever the Court rules out is not to be considered by you in any manner, shape or form, so I will tell you that you are to disregard that statement by the District Attorney give it no weight or consideration whatsoever and the Court will deny the motion for the mistrial.”
 

 Previously, in the presence of the jury, Frazier was asked, “Mr. Frazier, are these the pants and shirts that Joe Woodard was wearing that night?” Counsel for the defendants objected to the question on the ■ground that the evidence had been excluded, and that there was an improper display of it. The State withdrew the evidence; the jury was retired; counsel for the defendants identified the evidence; colloquy followed; the trial judge denied the motion for a mistrial
 

 Defense counsel contend that despite the trial judge’s ruling, the rights of the defendants were prejudiced; they also contend that the defendants’ rights were prejudiced by the improper display of withdrawn evidence.
 

 A reading of the testimony attached to the instant bills convinces us that the substantial rights of the accused were not prejudiced. The trial judge properly instructed the jury at the time the instant errors were committed and again instructed it in his general charge as follows: — -“Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded by you.”
 

 The jurisprudence is legion that generally instructions of the trial court at proper time nullify the prejudicial effect of an improper statement made by a prosecuting officer during the course of trial. State v. Dowdy, 217 La. 773, 47 So.2d 496; State v. Brazile, 234 La. 145, 99 So.2d 62; State v. Brossette, 229 La. 420, 86 So.2d 87; State v. Jackson, 227 La. 642, 80 So.2d 105.
 

 Bills of Exceptions Nos. 44 and 45 are without merit.
 

 Bill of Exceptions No. 46 was reserved when, outside of the presence of the jury, the trial judge ruled that Reverend John D. Bell, a Methodist Minister of the Gospel who visited the Avoyelles Parish Jail on the morning of April 20, 1964, could testify before the jury that during a conversation between the defendants .and an
 
 *176
 
 unidentified third person be overheard defendant Woodard make the statement, “I wish to hell I had had time to stomp some more to death.”
 

 Bill of Exceptions No. 47 was reserved when the trial judge ruled during trial and in the presence of the jury that Reverend Bell’s testimony that he overheard defendant Woodard say in a conversation between the defendants and an unidentified third person, “I wish to hell that I had had time to stomp another one to death,” was admissible.
 

 Counsel for the defendants contend that the proper foundation and predicate were not laid for the testimony, and that it was prejudicial to the defendants, being fragmentary in nature.
 

 We have read all of the testimony attached to the instant bills and find that proper foundation and predicate were laid for Reverend Bell’s statement. His extensive testimony outlines in detail his mission at the jail, his visibility of the defendants, and his position at the time defendant Woodard’s statement was overheard.
 

 We do not find that the statement, supra, is incomplete. It expresses a complete thought. The unidentified person was Billy Frazier, and he testified that he did not hear Joe Woodard make a statement to the effect “I wish I had more time I’d of stomped — so I could stomp some others or another one to death.” The jury therefore had for consideration the testimony of Frazier and Reverend Bell, which was contradictory. Defense counsel have not specifically shown us how the defendants suffered such prejudice by the admission of the statement overheard by Reverend Bell as would warrant reversal. We do not find that the trial judge abused his discretion or committed reversible error by allowing the Reverend Bell to testify as he did.
 

 Bills of Exceptions Nos. 46 and 47 are without merit.
 

 Bill of Exceptions No. 49 was reserved when the trial court overruled defense counsel’s motion for a mistrial.
 

 Lionel Bonstaff, Jailer for the Sheriff of Avoyelles Parish who was on duty April 19th and 20th, 1964, appeared as a witness for the defendants. On cross-examination, the following testimony was adduced:
 

 “Q. Mr. Bonstaff, I have one question before the Jury goes upstairs. I talked to you in the jail about ten days or two weeks ago. Do you remember telling me that the Jury was not going to find these defendants guilty?
 

 “A. No, I don’t tell you that.
 

 “Q. Didn’t you tell me that?
 

 “A.
 
 No, I don’t tell you that.”
 

 Counsel for the defendants contended that the above testimony was grossly ir
 
 *178
 
 relevant, immaterial, improper examination, and an obvious attempt on the part of the State to try to impeach the credibility of a witness in a grossly improper manner.
 

 The trial court stated, “The Court will instruct the Jury to disregard this question and this answer by the witness, and will deny the defense counsel’s request for a mistrial.”
 

 Under the circumstances connected with the reserving of the instant bill, we do not find that the defendants suffered prejudice. The trial judge properly instructed the jury; he corrected any mistake made by the State in the cross-examination. Our discussion of Bills of Exceptions Nos. 44 and 45 applies to the instant bill. No further discussion is necessary.
 

 Bill of Exceptions No. 49 is without merit.
 

 Bill of Exceptions No. 50 was reserved when the trial judge refused to delete references to general criminal intent in his charge to the jury.
 

 The statement objected to by counsel for the defendants recited, “General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender in the ordinary course of human experience must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.”
 

 Counsel for the defendants contend that a charge as to general criminal intent was not applicable to the case, but only specific intent, and, accordingly, when the trial court charged the jury with respect to what was not specific intent (evidently meaning general intent), the latter portion of the charge which followed the instruction as to specific intent was inapplicable and should not have been given. It is contended that the trial judge committed error.
 

 We have read the trial judge’s charge to the jury and find that no reversible error was committed by the reference to general criminal intent. The statement objected to was included in a paragraph which also described specific criminal intent. The statement with respect to general criminal intent was a differentiation from specific criminal intent. The entire paragraph was therefore a definition of criminal intent, which was properly recited. LSA-R.S. 14:10.
 

 Bill of Exceptions No. 50 is without merit.
 

 Bill of Exceptions No. 51 was reserved when the trial judge denied and refused to give Special Charges Nos. 3, 5, 9, 10, 11, 12, 13, 16 and 21.
 

 Defense counsel contend that the denial of the special charges by the trial court constituted prejudicial error. They further contend that a consideration by the
 
 *180
 
 jury of the law embodied in the special charges was essential in order to accord defendants a fair and impartial trial and due process under the federal and state constitutions.
 

 Special Charge No. 3 treated of negligent homicide. Counsel requested that the trial judge instruct the jury with respect to the law of negligent homicide and criminal negligence.
 

 We find that the trial judge was correct in refusing to give Special Charge No. 3. Negligent homicide was not a responsive verdict under the instant indictment. It is also a separate and distinct offense. See, LSA-R.S. 14:32 and 14:12.
 

 Special Charges Nos. 5 and 21 treated of the credibility of witnesses and of the appreciation of the jury of the witnesses’ testimony.
 

 We find that the trial judge covered the matter set forth in Special Charges Nos. 5 and 21 in his general charge. The trial judge is not required to give a special charge where matter contained in such charge has already been given in general charge. State v. Bickham, 239 La. 1094, 121 So.2d 207, cert. denied, 364 U.S. 874, 81 S.Ct. 123, 5 L.Ed.2d 98.
 

 Special Charges Nos. 10, 11 and 12 treated in great part of arrest. This was a matter involving a question of law, addressed to the trial judge for decision. He properly refused to give the instant special charges to the jury.
 

 Special Charges Nos. 9 and 13 treated of confessions, admissions, and statements. This matter was covered in detail in the trial judge’s general charge. LSA-R.S. 15 :390.
 

 Special Charge No. 16 concerned informers and the self-interest of witnesses. The same matter was practically covered in Special Charge No. 6, which was given to the jury.
 

 We find no abuse of discretion by the trial judge in refusing to give Special Charges Nos. 3, 5, 9, 10, 11, 12, 13, 16 and 21. His per curiam sets forth the correctness of his ruling:
 

 “The Court rejected the special charges numbered 3, 5, 9, 10, 11, 12, 13, 16 and 21, becaxxse same were already fully covered in its general written charge, or were matters which the jury should not receive as pertaining to the guilt or innocence of the defendants. * * * ”
 

 Bill of Exceptions No. 51 is without merit.
 

 Bill of Exceptions No. 52 was reserved when the trial judge refxxsed to grant defendants a mistrial on the ground that a remark made by the District Attorney in rebuttal argument on behalf of the State was improper and prejudicial to the defense.
 

 
 *182
 
 During the course of rebuttal argument, the District Attorney stated:
 

 “I will agree with one thing — one thing that was said — I will agree with this, ‘A picture is worth ten thousand words.’ I had a lot of pictures and you all couldn’t see them.”
 

 After defense counsel objected to the above remark, we find from the record that the trial judge instructed the jury as follows :
 

 “You Gentlemen of the Jury will disregard that statement as to pictures you did not see. Any evidence that was excluded during the process of this trial are not to be considered by you in any manner, shape or form, and the statement of the District Attorney is (Inaudible) — they are to be disregarded by you. The Court will deny of course the motion for a mistrial in view of this statement to disregard.”
 

 We are of the opinion that the instruction of the trial court had the effect of erasing from the minds of the jury any prejudice that
 
 may have been
 
 produced by the District Attorney’s remark. The general rule is that instruction of the court at the proper time nullifies the prejudicial effect of an improper statement made by a prosecuting officer during the course of the trial. State v. Dowdy, 217 La. 773, 47 So.2d 496.
 

 Bill of Exceptions No. 52 is without merit.
 

 Bill of Exceptions No. 53 was reserved when the trial judge denied defendants’ motion to set aside the verdict and for a new trial.
 

 The motion supra alleges that the trial judge committed error in his rulings on the bills of exceptions we have previously treated. No further discussion of these matters is necessary.
 

 New errors advanced in Articles 33, 37 and 38 of the motion for a new trial are as follows :
 

 “33.
 

 “Error was committed when the defendants were not present at the time that the jury went outside the courtroom to the parking lot adjoining the courthouse to view Defendants’ Exhibit 22 [1963 Corvan Panel Truck].”
 

 “37.
 

 “Error in these proceedings was committed when the jury
 
 was
 
 permitted
 
 to
 
 examine the jail facilities in the Avoyelles Parish Courthouse during the course of the trial outside the presence of the defendants; especially is this true because of the District Attorney’s statements in closing argument regarding toilet.”
 

 
 *184
 
 “38.
 

 “Error was committed by the District Attorney during his closing argument when, among other things, he made the following statements to the jury:
 

 “ ‘And this security, Gentlemen of the Jury, this security in the jail — that’s too big a joke to even discuss. I want to ask you this — you all looked in that jail cell — and I don’t like to mention that with ladies present, and this large a crowd in the courtroom, but did you all see a toilet in there? These men had to go to the toilet from the time that they got in there Sunday morning until sometime Monday morning — I feel certain. You don’t think they’d let them out?’
 

 “Error in this regard was committed because the District Attorney knew and had been informed that on April-19th, 20th and 21st and at all times from said dates up until a short time prior to the trial of this case, there was, in fact, a toilet in the cell occupied by the defendants on April 19th, 20th and 21st, 1964; these remarks were prejudicial; counsel for defendants did not learn, until after verdict, of the facts as they actually existed on April 19, 20 and 21 in 1964.”
 

 The record discloses that John C. Hopewell, Jr., a photographer employed by the Alexandria Daily Town Talk, testified to the effect that he made some photographs of a red panel truck, evidence involved in. this prosecution. At the time he was giving his testimony, the truck itself was located outside of the courthouse. The following' colloquy took place between counsel and; the trial court:
 

 “BY MR. ROY: Due to the fact that' both the State and the Defense have-agreed that the best evidence is the truck, and it’s outside, I submit that these pictures should not be introduced because-they are not the best evidence, and the best evidence is to go out there and look at the truck — again some of these pictures, through the use of light and shadows I would think could grossly exaggerate-some of the things on the truck, and I think the Jury ought to go out there and look at the truck — that’s the best evidence — it’s here, and these pictures are-secondary evidence and they should not be admitted.
 

 “BY MR. GRAVEL: Your Honor, as-I stated before we brought the truck here-for the purpose of the Jury seeing it, but' for the record it is necessary, we believe,, to make the filings—
 

 “BY THE COURT: The Court will' permit the filings and their viewing by the Jury.
 

 “BY MR. GRAVEL: I’m going to pass these around — the first one for the-Jury’s information, ‘Defendant’s Exhibit 13’ they have already viewed but I’m
 
 *186
 
 going to keep them in sequence and start with Mr. Normand and just let them see the entire series.
 

 “BY THE COURT: All right.
 

 “
 
 * * *
 

 “MR. GRAVEL: I object to that, he’s testified as to — the truck is outside that we brought here for the Jury to see and we have no objections to them seeing it. The photographs were made both for the purpose of having them at time of argument and also for the record and I object to any further interrogation as being irrelevant and immaterial about the truck outside.
 

 i: * * *
 

 “MR. ROY: Judge, I again ask that the Jury he allowed to go look at that dent, go look at that truck right now, let’s find out if this is accurate or let the witness go out and look at the truck right now and come hack and answer that question.
 

 “MR. GRAVEL: I move that the Jury he permitted to examine the truck at this time, Your Honor.
 

 “BY THE COURT: Yes, I would like to talk with you gentlemen before they go, you two attorneys.
 

 “BY THE COURT: We will go down and look at the truck. I’ll go along, the Sheriff will go along also, the District Attorney, the Clerk and the Defense Attorneys. Don’t ask any questions, none of us can tell you anything, we can’t give anything because what we do would have to he recorded, so you can look around, you can go on all sides, each of you see it for yourselves, don’t discuss it, don’t call others to see anything, just each of you see what you want to see. Later on when you deliberate on the case you can call each others attention or whatever you saw and so on, but I want to explain that we can’t give testimony outside, we can’t ask questions outside, the Attorneys can’t make any speeches or even the Court — you understand. I shall accompany you all with the Sheriff, the Clerk and the Attorneys on both sides and we will go down and look at it, after which we will recess for the noon hour and you are under your same instructions.
 

 “COURT RECESSED”
 

 We find that the trial judge’s per curiam to the instant hill, quoted hereinafter, fully answers defendants’ contentions with respect to the jury’s viewing the red panel truck and shows the incorrectness of said contentions. The trial judge specifically states that the defendants and other spectators looked through the windows of the courtroom and watched the examination of the truck on the parking lot downstairs. We conclude that the defendants’ looking through the windows was the equivalent of their being present at the examination.
 

 
 *188
 
 After the examination of the truck, the ■court entertained a recess for lunch. Court later convened, and Lionel Bonstaff, Jailer with the Sheriff of Avoyelles Parish, gave his testimony with respect to jail conditions and the events which occurred in the jail itself. After the District Attorney ■questioned the witness, the following colloquy took place:
 

 “BY MR. GRAVEL: Your Honor, in connection with the testimony of this witness the defendants request of the ■Court that the Jury be permitted to see the cell where these defendants were, and have without making any statement have Mr. Bonstaff demonstrate how he opens and closes that particular cell door. They will know and be able to visualize and see the cell and the area adjacent thereto.
 

 “BY MR. ROY: Your Honor, before you rule on this the State certainly has no ■objection to the Jury going up to the jail, .as a matter of fact we would want them to go up but this is a very obvious attempt to impeach the testimony of Reverend Bell who is not here to defend himself. I would like to ask the Court to withhold allowing the Jury to go up there. If this man can demonstrate such things I’d like to have Reverend Bell here to be .able to demonstrate things to the Jury too, then we will all go up there.
 

 “BY MR. GRAVEL: Reverend Bell ■didn’t even know which cell they were in.
 

 “BY MR. ROY: He can show which one he was in—
 

 “BY MR. GRAVEL: I’m not here to argue that, I think that the request in the light of the testimony of this witness and as part of the defense of this case we request — the request is one that certainly should be made — we do make it on behalf of the defendants, and ask Your Honor to grant the request.
 

 “BY THE COURT: I think we can work that out some time before it goes to the Jury.
 

 “BY MR. GRAVEL: Your Honor, I’d like to do that now, please, if I may.
 

 “BY THE COURT: I would have to have a conference with you gentlemen, there’s some complications there that I don’t know how to work out at this time.
 

 “BY MR. GRAVEL: I believe I can anticipate them, may we approach the bench ?
 

 “BY THE COURT: Yes.
 

 “
 
 * *
 

 “BY MR. GRAVEL: Yes, sir, by reference make it part of the record, and by reference refer to it as ‘Defendant’s Exhibit 22’ [red Corvan Panel Truck inspected by the jury] — by reference I also make part of the record ‘Defendant’s Exhibit 23’ — the jail. I think that’s proper, Your Honor, when the Jury does view something outside of the Court
 
 *190
 
 room.” (We presumo that the jury had examined the jail cell at the time of counsel’s statement.)
 

 A reading of the testimony of record discloses that the testimony of the witnesses was contradictory with respect to the security and physical conditions, appearance, appurtenances, and visibility of the jail cell occupied by the defendants on Monday, April 20, 1964.
 
 [13]
 

 Defense counsel requested that the jury examine the jail cell, and counsel for the State was in accord. We gather that it was the purpose of counsel to let the jury see for itself the cell occupied by the defendants on April 20, 1964, and then make its own decision as to the credibility of the witnesses’ testimony with respect thereto.
 

 Defendants were present when all testimony was adduced. Defendants heard Rev. Bell testify that they were visible to him. They heard other witnesses testify, as to steel doors, grill work, and maximum security. Defendants themselves occupied the cell on April 20, 1964.
 

 After requesting that the jury examine the jail cell, counsel for the defendants agreed to all conditions imposed by the trial judge. They did not ask that the defendants view the cell in the company of the jury.
 

 Since the appearance of the jail cell and its viewing had to do with the credibility of the witnesses as to their recollection of the cell’s physical condition, we find that the defendants were not prejudiced by not being present at the inspection. The viewing of the cell had nothing to do with examining the scene of the commission of the crime or with evidence associated with the commission thereof.' We conclude that the presence of defendants was not necessary, and that the rule that one who is tried for a felony must be personally present in court at every important stage of the trial from the moment of his arraignment to his sentence was not violated herein. Cf. State v. Futrell, 159 La. 1093, 106 So. 651; State v. Pepper, 189 La. 795, 180 So. 640; State v. Breedlove, 199 La. 965, 7 So.2d 221.
 

 We do not find that the trial judge committed reversible error in denying the instant motion. His per curiam fully explains his reasons as follows:
 

 “This bill refers to the jury viewing the truck offered in evidence and a certain jail cell in the Parish jail, without being accompanied by the defendants. No objection was made at the time; counsel for defendants waived their clients’ presence. Counsel for defendants wanted
 
 *192
 
 the jury to go see the truck parked outside the Courthouse, on the Courthouse parking lot. The Courtroom is on the third floor. The Court called a conference of the District Attorney and counsel for defendants. I stated that if we could agree on when this would be done and who was to go with the jury, I would arrange a visit to the truck, on the parking lot, by the jury. The attorneys for both sides were called up to my desk. It was agreed that just before the noon recess, the jury, the attorneys for both sides, the Court, the Clerk of Court and the deputies in charge of the jury would walk down the stairs and view the truck. It was further agreed that all others, spectators, etc., would be removed from the area; that there was to be no talking or questions asked about the case or about the truck. That after viewing the truck in this manner, the jury would be released to the Sheriff’s custody for their noon day meal, without returning to'the Courtroom. It is the Court’s recollection
 
 that the defendants
 
 and other spectators
 
 looked through the windows of the Courtroom to watch the examination of the truck on the parking lot downstairs.
 

 “As
 
 for the jail cell, the same procedure was followed. Attorneys for both sides were called to the bench and agreed to let the jury go upstairs (4th floor) from the 3rd floor, without the defendants accompanying them, but with the attorneys, the Court, the deputies in charge and the clerk. They were to march or walk up a stairway and there was to be no questioning or testimony of any kind during the visit.
 

 “On both occasions, Court was recessed for the purpose and on both occasions the procedure was agreed to by the attorney for the defendants and the district attorney and never was there any objection to the procedure by anyone. The matter was raised for the first time in the Motion for a New Trial.
 

 “REASON: We were operating in crowded quarters. The Court wanted to keep the jury separate and apart from the defendants and the courtroom spectators. The narrow stairways, crowded jail, etc., would have made it impossible to separate the jury from the defendants. All the sheriff’s force, except two deputies were under the rule as witnesses in the case and this was the only way the visits could be arranged. The problems involved were pointed out to the attorneys by the Court, at the bench, privately, before the viewing visits, and all agreed to same as proposed, beforehand, and without objection.” (Emphasis ours.)
 

 The authorities relied upon by counsel for defendants are not apposite.
 

 Bill of Exceptions No. 53 is without merit.
 

 For the reasons assigned, the conviction and sentence are affiimed.
 

 [1]
 

 . Art. 63 of the new Code of Criminal Procedure, which has replaced LSA-R.S. 15:17 in part, provides: — “The district attorney may employ or accept the assistance of other counsel in the conduct of a criminal case.”
 

 [2]
 

 . The following allegations are from. Bill of Exceptions No. 4:
 

 “1. While Dr. Henry Kaufman, the Coroner, was on the witness stand, the Court permitted the District Attorney to ask witness, ‘Did defendant, John Hopper, appear to he afraid at that time?’ (reference being made to the time Coroner was taking an incriminating statement from the accused Hopper). This question was objected to on the ground that it called for an opinion as to the state of mind of the defendant, to which an objection was made and overruled and a Bill reserved.
 

 “2. While Chief of Police Paul Dubea was on the witness stand, the District Attorney on direct examination asked him: ‘Did Mr. Woodard say whether the statement was true or correct?’ (referring to the alleged statement made by the defendant Woodard). Objection was made on the ground that it was leading and suggestive of an answer. The Court overruled the objection and defendants, through counsel, reserved a Bill of Exceptions.
 

 “3. While Chief of Police Duhea was being examined by the District Attorney, he was asked: ‘Chief Dubea, do you recall if Major Henderson would have asked Mr. Hopper (defendant) if the notes that he showed him (alleged statement of the accused) were true and correct?’. Question was objected to on the grounds that it was leading. Objection was overruled and a Bill of Exception was reserved.
 

 “4. While the District Attorney was examining Chief of Police Duhea in the presence of the jury, the District Attorney asked him: Was the defendant then asked by Major Henderson if the contents were true and correct?’. Objection was made on the ground that the question was leading. The Court overruled the objection and a Bill of Exception was reserved.
 

 “5. While Gary Morrison, a witness for the State, was being examined by the District Attorney, the witness was asked the following question: ‘Did you see either or both of these defendants lay a hand or any object on the deceased?’. To which the witness answered, ‘Yes, I had’. Then the District Attorney asked him, ‘What had they done to Ralph Beeson?’. At this point defendants, through counsel, objected on the ground that the question was repetitious; that the witness had already testified as to what he saw and what occurred there. Still further on in the questioning the District Attorney asked this witness, ‘Mr. Morrison, are you in a position to tell the jury how many of the kicks or blows you saw made by the defendant Joe Woodard or John Hopper actually hit the body of Ralph Beeson?’ To which question defendants, through counsel, objected on the ground that it was repetitious, the objection was overruled, and a Bill of Exception reserved.
 

 “6. While Gary Morrison was testifying on behalf of the State, the District Attorney asked him if the truck that he
 
 *104
 
 saw on tbe occasion of April 19, 1964, at the Pelican Club appeared similar to tbe type truck shown in a picture which the District Attorney displayed to the witness. Objection was made on the ground that the picture, which was unmar-ked and not identified, had already been presented to the witness and that the District Attorney was leading the witness, not only by questions but by presentation to the witness of an unidentified piece of paper on which there is on one side one kind of vehicle and on the other side several kinds of vehicles. The objection was overruled by the Court and a Bill of Exception was reserved, and the document marked ‘State Trial No. 9’ made part of the Bill.”
 

 [3]
 

 . We have copied the statements in their entirety, in order that the reader might have an appreciation of the alleged facts of this case.
 

 [4]
 

 . Aguilar v. State of Texas involved search, and seizure.
 

 [5]
 

 . “Louisiana’s standard is set by the legislature. Article 60 of our Code
 
 of
 
 Crim
 
 *120
 
 inal Procedure permits an arrest by a peace officer without a warrant, ‘When a felony in fact has been committed and he has reasonable cause to believe that such person has committed it. * * * ’
 

 “Reasonable belief — or ‘probable cause’, as it is termed under the federal standard — to make an arrest without a warrant exists when the facts and circumstances within the arresting officer’s knowledge, and of which he has reasonably trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a felony has been or is being committed. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); State v. Green, 244 La. 80, 150 So.2d 571 (1963); State v. Aias, 243 La. 945, 149 So.2d 400 (1963); State v. Calascione, 243 La. 993, 149 So.2d 417 (1963).
 

 “Compliance with these standards is, in the first instance, a substantive determination to be made by the trial court from the facts and circumstances of the case. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); State v. McIlvaine, 247 La. 747, 174 So. 2d 515 (1965).
 

 “And in determining compliance with these standards it is not the proof required for conviction which concerns us. Proof required to satisfy the requirement of reasonable belief or probable cause is less and is what the terms imply: probabilities and practical considerations of everyday life on which reasonable men could reasonably be expected to act. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); State v. Bourg, 248 La. 844, 182 So.2d. 510 (1966).
 

 “In such cases, because only factual issues are presented by the contentions, the setting in which the arrests took place-becomes a factor of prime importance; facts and circumstances known to the arresting officers from which they might draw conclusions warranted by their training and experience become the focus of our attention with due allowance for the discretion vested in the trial court.” State v. Johnson, 249 La. 950, 192 So.2d 135.
 

 [6]
 

 . The District Attorney did not sign the statement because he was not in Henderson’s office during the entire questioning.
 

 [7]
 

 . “Persons jointly indicted shall be joint- . ly tried, unless the district attorney elect to place such persons separately upon trial, or unless the court, upon motion of defendant, shall, after a hearing contradictorily with the district attorney, order a severance.” LSA-K.S. 15:316.
 

 [8]
 

 . “All evidence relating to any oral admission or oral confessions or other incriminating statements claimed to have been made by a defendant, outside of Court, should be considered with caution and weighed with great care. And, you, Gentlemen, must be convinced beyond all reasonable doubt that such were freely and voluntarily given.
 

 “ * * *
 

 “And, in the ease of a confession, made outside of Court, by one defendant, it should not be considered by the j'ury as evidence against the other defendant who was not present or not a party to such confession.
 

 «* * *
 

 “Although there are two defendants and they are j'ointly charged with the same crime, it is your duty, Gentlemen of the Jury, to give separate, personal consideration to the case of each individual defendant. When you do so, you should analyze what the evidence shows with respect to that individual, leaving out of consideration, entirely, any evidence admitted solely against some other defendant, each defendant is entitled to have his case determined from his own acts and statements, and the other evidence in the ease as may be applicable to him.”
 

 [9]
 

 . “Although, a juror may have been accepted by both the prosecution and the defense, he may, none the less, up to the beginning of the taking of evidence, be challenged for cause by either side, or he excused either for cause or by consent of both sides.” LSA-R.S. 15:359 (now Art. 795 of the new Code of Criminal Procedure.)
 

 [10]
 

 . “The jurors shall be tendered first to the prosecution, and, if accepted, then tendered to the defense. After a juror has been accepted by both sides, neither side has the right to challenge him peremptorily, hut it shall be within the discretion of the court, and not subject to review to allow either side to peremptorily challenge jurors up to the time that the jury is impaneled.” LSA-R.S. 15:358 (See, Arts. 788 and 795 of the new Code of Criminal Procedure.)
 

 [11]
 

 . “The qualifications to servo as a grand juror or a petit juror in any of the courts of this state shall be as follows:
 

 “To he a citizen of this state, not less than twenty-one years of age, a bona fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color or previous condition of servitude; and provided further, that the district judge shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.
 

 “In addition to the foregoing qualifications, jurors shall be persons of well known good character and standing in the community.” LSA-R.S. 15:172 (See, Articles 401 and 787 of the new Code of
 
 Criminal
 
 Procedure.)
 

 [12]
 

 . The jury which rendered the verdict does not bear the name of Alvin Coco.
 

 [13]
 

 . We find the following stipulation in the testimony taken on the motion for a new trial: “It is stipulated between the defense and the prosecution that there were toilet facilities in the cell occupied by the defendants on April 19th., 20th., 21st., 1964 and that these facilities were removed sometime — short time prior to the trial and in 1965.”